NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3692-15T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SUI KAM TUNG, a/k/a
TONY TUNG,

    Defendant-Appellant.

_____

> Argued February 27, 2019 – Decided June 28, 2019
>
> Before Judges Koblitz, Currier and Mayer.
>
> On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 13-06-0793.
>
> Daniel S. Rockoff, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Daniel S. Rockoff, of counsel and on the briefs).
>
> Ian C. Kennedy, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Dennis Calo, Acting Bergen County Prosecutor, attorney; Ian C. Kennedy, of counsel and on the brief).

The opinion of the court was delivered by

KOBLITZ, P.J.A.D.

After a jury trial, defendant Sui Kam Tung appeals from the March 31, 2016 convictions for murder of his estranged wife's lover and related charges. Defendant argues that the trial court erred in allowing (1) evidence of his invocation of the right to counsel, (2) references to his refusal to consent to a search of his computer and car, and (3) testimony by the interrogating officer that he knew defendant was lying. We agree that these three issues combine to undermine the integrity of the verdict and reverse.

The jury found defendant guilty of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); second-degree aggravated arson, N.J.S.A. 2C:17-1(a)(2); second-degree possession of a weapon with unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); second-degree desecration of human remains, N.J.S.A. 2C:22-1(a)(2); third-degree hindering by way of concealment or destruction of evidence, N.J.S.A. 2C:29-3(b)(1); fourth-degree tampering by destroying computer data, N.J.S.A. 2C:28-6(1); and fourth-degree stalking, N.J.S.A. 2C:12-10(b).[1]

---

[1] The jury found defendant not guilty of second-degree burglary, N.J.S.A. 2C:18-2; first-degree felony murder during a burglary, N.J.S.A. 2C:11-3(a)(3); and first-degree felony murder during an act of arson, N.J.S.A. 2C:11-3(a)(3).

The court sentenced defendant for murder to a life term, subject to more than sixty-three years of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2. He received a consecutive ten-year term with a five-year parole disqualifier for aggravated arson. The remaining convictions either merged or the court sentenced defendant to concurrent terms.

## I. The March 6, 2011 Murder and Prior Events

Robert Cantor was shot in the back of the head while in his home in Teaneck, New Jersey. His body was placed on the bed in the basement bedroom, doused with an accelerant, and set on fire. Defendant was the estranged husband of Cantor's girlfriend, S.,[2] and was the only suspect considered by the police.

S. and Cantor had sexual relations for the first time in February 2010, in the basement bedroom of Cantor's home. Defendant acknowledged to the police that he found out about the affair between Cantor and S. through their email exchanges he downloaded from S.'s computer. A computer expert who searched defendant's computer found 299 saved emails between Cantor and S. In early 2010, defendant, who owned a computer store, installed software on his wife's laptop that enabled him to record her exact keystrokes. Defendant also created an email address and sent anonymous emails to Cantor.

---

[2] We use an initial to preserve the confidentiality of defendant's wife.

A-3692-15T1

On the night of February 16, 2010, S. told defendant she was aware that he knew about her and Cantor. Defendant asked S. where she and Cantor had slept together, and she told him it was in a basement bedroom of Cantor's house. Defendant told her not to see Cantor.

On February 18, defendant told S. he was going to take $2000 from their savings to buy a gun "to protect you and the kids and myself." Their bank statement showed a cash withdrawal for $2000. Later that day, defendant showed her a black handgun. Defendant told the police he showed S. a friend's gun, a "small Beretta," during this time period. He said he gave it back to his friend.

In March 2010, defendant's wife and daughters moved out of the marital apartment. In the spring of 2010, defendant went to Cantor's home in Teaneck three times. Defendant told the police that on the first occasion, they sat in the living room and spoke for about three hours. Defendant told Cantor, "I want you to stop seeing my wife." During this first meeting, defendant said he and Cantor went "down in the basement . . . [b]ecause from the e-mails, I wanted to

A-3692-15T1

know where they actually have relationship."[3] S. testified Cantor had told her of this three-hour visit.

Defendant said the second time he went to Cantor's house was about a month later and their conversation was brief. The third time defendant went to speak to Cantor, Cantor was on his way to work and did not let defendant into the house.

S. testified that defendant liked to go to shooting ranges. Defendant's friend who lived in Texas testified that in early November 2010, defendant called him and asked him "to possibly get him a magazine for a Walther PPX" handgun. The friend did not supply the magazine and defendant said it was "no big deal."

On March 3, 2011, S. served defendant with divorce papers. Defendant told the police he intended to raise the grounds of adultery and put both Cantor and S. "on the stand."

Defendant spent Sunday, March 6, the day of the murder, with his youngest daughter. At about 8:00 p.m., defendant took her back to S.'s apartment and spent about twenty minutes with all three of his daughters. The

---

[3] Although an American citizen, defendant was born in China and English is not his first language. We have not edited his statements, nor those of the police officers.

middle child told defendant she met "a guy named Robbie" who was "mommy's friend" when she went to the museum with S. that day. Cantor had never before met any of defendant's children. Defendant told the police he was not angry because "[i]t was bound to happen."

At approximately 11:30 p.m. on March 6, neighbors saw a fire at Cantor's home. His body was found in the basement. He had been shot in the back of the head and died before the fire was started. The police found a 380-caliber shell casing in the basement, under the bed. The 380-caliber gun for which defendant had asked his friend to procure a magazine in November 2010 could be loaded and fired without a magazine.

## II. Defendant's Statement

On March 7, 2011, Bergen County Prosecutor's Office Detective James Brazofsky and Teaneck Detective Mark Fisco interviewed defendant at a New York City police station. Brazofsky used a small digital voice recorder because "[t]he 23rd Precinct did not have audio and video recording capabilities."

Defendant said that on March 6, after he dropped his daughter off with S., he returned to his apartment, had two or three beers, read emails, read books, and washed dishes and "[t]hat took about an hour and a half, two hours." At about 1:00 a.m., he went to a store and bought some beer. A store clerk later

confirmed that defendant bought beer between 1:00 and 2:00 a.m. on March 7, 2011. He repeatedly denied going anywhere else that night and said he did not leave Manhattan. Defendant acknowledged that he learned of the relationship between S. and Cantor by placing software on her laptop. Fisco continued to question defendant:

> There was a situation that happened last night. Okay. And I believe that you left, at some point you left New York City and you traveled into New Jersey last night. Okay. And I -- I want you to be honest with us.
>
> [DETECTIVE] FISCO: It's very important that you be honest with us here, Tony. All right? I think some things you have been honest with us about, other things you may have left out and not been so honest about. Tell us about Jersey last night.
>
> A: I was, uh (inaudible). I was --
>
> Q: I -- I don't think you were home all night last night.
>
> DETECTIVE FISCO: What time were you in Jersey last night?
>
> A: Why would I be in Jersey? What time was I in Jersey? What are we talking about here?

Brazofsky repeated that he believed defendant "went over there" the night before and that he was acting under the emotional stress of the divorce and financial troubles, and he suggested that cell phone records, EZ Pass records, or other electronic surveillance would show defendant had traveled to New Jersey.

7

Brazofsky asked:

> Q: Okay. Let me ask you this: Would you allow us,
> um, to have a computer forensic examiner look at your
> activity last night on the computer from, say, I don't
> know, 5:00 p.m. to, I don't know, 7:00 a.m. this
> morning? Just to look for activity, not to search
> through your personal stuff or anything like that. Just
> to look at the activity on the computer to see if --
>
> A: I think I would speak to my lawyer about that first.
>
> Q: Okay. That's fine. You could do that.

Brazofsky also asked for consent to search defendant's car, stating, "My goal is, if you didn't do anything last night, then there shouldn't be any evidence related to the incident last night in -- in your car, basically." Defendant responded repeatedly that he wanted to consult his attorney first before agreeing to either search.

Brazofsky suggested that cell phone records could show defendant went to New Jersey and defendant acknowledged that "certain records don't lie" and that "I can't argue against" that sort of evidence. Brazofsky then asked defendant to admit he was in New Jersey, saying in part:

> Can you be honest with me and tell me where you were
> last night? Cause I'm telling you, I could see it in your
> face, and I can see it in the way you're sitting there, I
> can see that you're not -- you're not at home last night.
> Something happened and you did something that you're
> sorry about. I can see it in your eyes. Okay.

8

Brazofsky suggested that defendant was "pushed . . . over the edge" when he learned that Cantor had contact with his daughter. Brazofsky again told defendant, "[Y]ou went there last night. Okay. I know you did. I believe you did."

Brazofsky again asked to search defendant's computer:

> Um, why before -- and you have every right to say no, but I just wanna ask you for your reason why you said no. Why would -- if you had nothing to hide, that you weren't in New Jersey last night, why wouldn't you let me look at your computer to say, oh, my gosh, look, he was home? Why would -- why wouldn't you let me go to your computer just for the period of time that this incident took place to see if you were on the computer?

Brazofsky stated that "[i]t's only a matter of time" before "things come together," and defendant commented, "You need to prove it." Brazofsky then stated:

> I'll be honest with you, Tony. You -- you don't -- you don't have any of the reactions of a person who's telling me the truth. All right? I been doing this for [fifteen] years.

Brazofsky again stated:

> Do I believe that you were over there? Yeah, I believe you went over there, cause when I asked you a question before, you answered them like a person who's not being truthful. Cause I told you what my answer would have been. Jim, did you leave your house last night

after you put your kids to bed? No. I didn't go anywhere. I know for a fact I didn't go anywhere.

A: Um.

Q: Okay. You can look at my computer. You can look at my phone. You can talk to my kids. I -- you can talk to my neighbors. I don't care, cause I know I wasn't there. You didn't say that once. Not -- you still haven't said that. Okay. That's why I don't believe you're being truthful, okay?

The interview was terminated when defendant asked to call his lawyer.

### III. The Investigation

The police collected video evidence contradicting defendant's claim that he was home all night except for purchasing beer. Footage from cameras located near defendant's apartment showed defendant parking his car at about 10:10 p.m., and walking in the direction of his apartment. About twenty minutes later, the footage showed him leaving the apartment, and going out of view at about 10:40 p.m., not in the direction of his apartment.

On March 8, 2011, after obtaining a search warrant for defendant's apartment, the police seized defendant's desktop computer. A computer expert testified that, on March 6, 2011, all activity, whether generated by a user or the operating system, stopped on the computer at 9:48 p.m. Computer activity

began again on March 7 at 1:11 a.m.  At 2:00 a.m., a user launched a program that permanently deleted a large number of files from defendant's computer.

The police searched defendant's computer store.  Among other items, they found handwritten notes that included the name of Cantor's wife, her work address and job title as well as Cantor's name, cell phone number, and two email addresses.  The police also seized email correspondence between S. and Cantor, "a folder with assorted information on" S. and Cantor, and Google Map directions from Cantor's home in Teaneck to the apartment S. moved into, with a date of April 12, 2010.  In addition, the police found S.'s cell phone bill dated March 5, 2010, with calls to Cantor's cell phone highlighted.

The State presented no direct evidence that defendant left Manhattan on the night of the murder.

### IV. Use of Defendant's Statement at Trial

Defendant unsuccessfully moved pretrial to exclude his March 7, 2011, statement on the grounds that his agreement to speak to Brazofsky and Fisco without counsel present was not a knowing and voluntary waiver of his rights under Miranda v. Arizona, 384 U.S. 436, 473-74 (1966).  Defendant did not thereafter seek to exclude any portion of his statement as inadmissible, and the entire statement was transcribed for and played to the jury.

11

In his opening statement, the prosecutor asked the jury to "pay very, very, very careful attention to the statement of the defendant . . . ." He said, "Please, pay very careful attention to not just what he says but how he says what he says and why he says what he says. How he says it. Please."

At trial, Brazofsky testified at length about the statement and acknowledged that defendant was the prime suspect at the time he was questioned. Brazofsky testified that he had been assigned to "the polygraph unit" as a polygraph examiner for the last ten years.

Brazofsky acknowledged that defendant had been interrogated as opposed to interviewed, noting that standard practice was to Mirandize a person "[a]t any point where you are questioning a suspect with the intention of obtaining a confession."

Before the jury heard the audio playback, Brazofsky summarized the entire interrogation, including a number of the answers defendant gave in his statement and Brazofsky's interpretation of those responses. As detailed below, defense counsel largely did not object to Brazofsky's commentary. On a few occasions, the trial court sustained a defense objection to Brazofsky's testimony as "opinion," but some rulings were less clear and no limiting instruction was provided.

Brazofsky testified:

> I asked him if [S] had been dating anyone or had a boyfriend. And his first response to me was, you'd have to ask her. Based upon our -- my information base from the beginning of this case, obviously he wasn't being truthful when he answered that question.
>
> [DEFENSE COUNSEL]: Objection, your Honor. That's an opinion of the officer.
>
> THE COURT: I'll sustain the characterization. You can rephrase it.
>
> [PROSECUTOR]: No disagreement with counsel.

Shortly thereafter, Brazofsky testified:

> When I asked him about whether or not he left Manhattan at any point, his response -- he paused, looked at me, didn't answer right away, and said, no. In that fashion. I thought the answer was odd. It wasn't a --
>
> [DEFENSE COUNSEL]: Objection, your Honor. Again, opinion.
>
> THE COURT: All right.
>
> [PROSECUTOR]: I think he can at least give the jury his reaction. He can be cross-examined.
>
> [DEFENSE COUNSEL]: It's still an opinion.
>
> THE COURT: He answered it. Next question.

Brazofsky explained that after a break in the interview, "we were more, not confrontational, but more direct in our questions." Brazofsky said he told defendant he "did not believe what he was telling us," but he believed defendant went to Teaneck to confront Cantor. Brazofsky elaborated:

> And I asked him at certain points during this period of the interview if I would see him on any of these checks, whether it be a traffic camera showing his, you know, face walking by, or his cell phone not being in Manhattan, or his, you know, his likeness being on a surveillance camera. His responses were not denials. They were very vague. Things like, I believe he said, "I hope not," "shouldn't be," things like that. Never once did he say, no, absolutely not, I was home all night, you won't see me on any camera or anywhere else.

Brazofsky testified that defendant refused consent to search his computer, saying "words to the effect of, I think I'd talk to my lawyer first." He told the jury, "I just reinforced that, you know, you understand if you are home on the computer when this incident happened, that . . . would clear you as a suspect in this case. And he still declined to allow us to look at the computer." Brazofsky also testified that he asked for defendant's consent to search his vehicle, but defendant again said he would want to speak to a lawyer first. After another break in the interview, Brazofsky "again confronted [defendant] with the fact

that I did not believe he was being truthful. That I believe he went to New Jersey."

Brazofsky repeatedly explained to the jury that he "continued to confront him with the fact that I didn't believe he was home all night. I felt he went to Mr. Cantor's house. I felt there was an argument . . . . that somehow got out of control." When he told defendant the police would be looking for surveillance camera footage and things like that, defendant "continued to be evasive with his answers and say things like, 'I hope not,' 'shouldn't be.' Things of that nature."

Brazofsky said, "I believe at this point I asked him again if he was going to be truthful and tell us about going to New Jersey." Brazofsky again asked to search defendant's computer. "I informed him that, you know, activity on the computer would eliminate him as a suspect, and his response was, he did not want me to -- he was not giving me permission to look at the computer, 'so that's not another nail in my coffin.' was his response."

Later, the following exchange occurred:

> Q. I think you were at this point in your testimony where you stated that you, again, began to confront Mr. Tung; that you told Mr. Tung that you did not feel he was being truthful and that you believed he was in New Jersey that Sunday evening. Correct?
>
> A. That's correct.

15

Q. All right. At this time does he make any request of you?

A. He does. Just so I can explain, as we start to confront him and we start to explain to him that evidence is starting to come in and pile up and that he needs to be truthful with us so that we can understand what his intentions were, whether he went over there to hurt someone or just went over there to have a conversation with Rob Cantor and then a fight happened, where it was an unplanned, you know, spontaneous incident.

I speak, and at this point you'll hear it in the audio for a good period of time where he doesn't respond. He doesn't really say anything. He just sits there and listens to me. And I tell him that I don't believe he's a bad guy. I believe he's trying to protect his children.

. . . .

What I'm trying to do is get him to admit he did go over there, because he went over there just to speak to Robbie, just like he did the other times. That he didn't go over there with intentions to hurt him. It gives a person who's not being truthful a more palatable or less serious explanation of why they went to a house and why this happened.

So during this portion, I'm speaking a lot, and Tony Tung is just sitting there staring at me.

. . . .

All of a sudden, he looks up and says, I need to use the bathroom. And the question just prior to that was, tell us about going to New Jersey or tell us about last night,

why you went to New Jersey. And he realizes at that point that he can't answer that question.

[DEFENSE COUNSEL]: Objection, your Honor. That's --

THE COURT: All right, I'll sustain as to --

Q. Does he say he can't answer that question?

A. I believe he does. Right after that.

Q. Did you write it in your report?

A. Yes.

[DEFENSE COUNSEL]: That's fine, Judge, but not opinion. The statement is fine.

[PROSECUTOR]: Agreed.

A. He actually says, "I would like to go to the bathroom." And it was either myself or Detective Fisco said, "Can you just answer that one question, that last question?" And his words were, "No, I can't answer that now."

After defendant used the bathroom, Brazofsky "continued to confront him. That he's not being truthful with us." Brazofsky said that, after a few more minutes, defendant asked to call a lawyer and the interview stopped.

At that point in the trial, each juror received a copy of the transcript of the statement to follow along. The prosecutor, without objection, instructed Brazofsky:

17

Now, Detective, I'm going to ask you to begin playing the subject recording, if you would. And during the course of the recitation of this particular recording, if there are points at which you need to stop the recording to explain a particular piece of testimony as it is received, please feel free to do so. And we will stop the recording at that point, have your comments, and then continue with the recording.

During the playback of the statement, Brazofsky periodically offered comments, some of which addressed defendant's demeanor during questioning, but others addressed the quality of defendant's answers or his refusal to consent to searches. Without prompting or a question from the prosecutor, Brazofsky added that defendant has visited Cantor's home <u>four</u> times, which would include the night of the murder:

A. Where I ask Mr. Tung, "Is she dating anybody?" At this point he doesn't answer. He obviously knows. He's been to Mr. Cantor's house at least three times at this point. Four times. And he -- he's very vague with his answer. When I follow up with that, he again says, "I'm assuming," and still doesn't give me the information. It's almost as though he's --

[DEFENSE COUNSEL]: Judge, it's opinion again.

THE COURT: All right.

[DEFENSE COUNSEL]: The words speak for themselves.

[PROSECUTOR]: The context is also important.

18

THE COURT: But let's not give opinions on it, because they are hearing the tape.

After the part of defendant's statement where he said he went to Cantor's house because he "found out something," the playback paused and Brazofsky stated, again without being prompted by a question from the prosecutor:

> When I asked him this question, he answers, "Well, I know where he was working. I found out something." He pauses and doesn't -- he never says at this point how he found it out or where he found it out. He still hasn't disclosed the use of the [software] on the laptop . . . that he got his identity and his e-mail from the e-mail account used by [S]. But you can tell he's thinking about -- when he pauses, he's not answering --

At that point, the trial judge sustained the defense objection to Brazofsky testifying as to what defendant was thinking.

Towards the end of the day, Brazofsky stopped the playback, and said, again unprompted by any question from the prosecutor:

> I go over the part with him about the computer. And, as I'm detailing how we would search or what we would look at on the computer, he starts -- Tony Tung starts getting nervous. He's looking at me. He's clearly upset by this line of questioning. And when I explained to him how it could be beneficial if someone was on the computer at a certain time when an incident happened [fifteen] miles away at that exact moment, that that could be important evidence, he again declined to allow any search of his computer. And he --

19

[DEFENSE COUNSEL]: Objection, your Honor. That's his right to object to it.

[PROSECUTOR]: That's fine. But that's the statement. That's what Mr. Tung chose to do.

THE COURT: I'll allow it.

A. And then I went on a little bit further and, you know, I explained to him that there were other people being interviewed. And he mentions that he's the prime suspect. And I explained to him that, you know, if he were to do my job, who would he -- you know, who would he interview? Who would he put in the list of suspects? And the only person he answered was "Me." He didn't say anybody else.

When trial resumed two days later, Brazofsky was asked to explain a portion of the statement. Brazofsky responded:

We are at the point where I've begun to confront Mr. Tung on the fact that he's not being truthful about his whereabouts. This is the point where his demeanor has changed. He's starting to chain smoke and shift around in his seat.

Brazofsky was asked to describe what happened when Detective Fisco asked defendant: "Did you go home first or did you go right after you dropped your daughter off into Teaneck?" Brazofsky stated:

This was another point where Mr. Tung, his demeanor completely changed. He just basically sat there, stared at the floor. And he would look up, would look at Detective Fisco and I, and just was completely unresponsive. Never answered the question. I believe

20

he was asked two or three times, tell us about last night in Teaneck. And then there's just silence. Detective Fisco asks again, did you -- you left after you dropped your daughter off? And he just sits there and stares at us and, again, looks at the ground. He starts to just -- kind of slouches forward in his chair.

And then the last point in time where Detective Fisco says, "Did you go home first or did you go right after you dropped off your daughter," I think it's like over ten seconds of just complete silence, where he can't answer, doesn't answer the question.

And then he asks to use the bathroom so that he cannot answer that question and stop --

[DEFENSE COUNSEL]: Objection, you Honor.

THE COURT: I'll sustain it.

The prosecutor, in his closing, asked the jury to "[r]emember the vague answers that [defendant] gives." The prosecutor also made several references to defendant's "lie[s]" to the police in the statement. After reviewing the video footage near defendant's apartment, the prosecutor said that "we now know that" defendant's statement that he stayed home all night "is a lie" because "[h]e is out and about and off the grid" at 10:40 p.m.

The prosecutor said Brazofsky told defendant that if it were Brazofsky being questioned, his responses would have been clear and unequivocal. The prosecutor remarked, "That's what truth sounds like," and he contrasted it with

21

defendant's responses, which he likened to "a cat-and-mouse game" that "hardly . . . sounds like someone who is innocent and who has stated the truth, which we know he did not . . . ."

Near the end of closing, the prosecutor summarized: "Ladies and gentlemen, this case is about motive, motive, motive. Where that body was found and the circumstances under which it was found. He lied in his statement to the police. If he lied, then he must be guilty."

At its request, the jury heard the full audio statement again in open court the following day, using the transcript as an aid.

Defendant raises the following issues on appeal:

> POINT I: BECAUSE INTERROGATORS FAILED TO SCRUPULOUSLY HONOR MR. TUNG'S UNAMBIGUOUS ASSERTION THAT HE WAS "NOT WAIVING THE RIGHT" TO COUNSEL DURING QUESTIONING, THE LOWER COURT ERRED BY FINDING HIS SUBSEQUENT STATEMENT ADMISSIBLE. U.S. CONST. AMENDS. V, XIV.

> POINT II: THE COURT ERRED BY PERMITTING THE STATE, OVER THE DEFENDANT'S OBJECTION, TO SHARE WITH THE JURY MR. TUNG'S ASSERTIONS OF HIS FOURTH AMENDMENT RIGHT TO BE FREE OF UNREASONABLE SEARCHES, AND HIS FIFTH AMENDMENT RIGHT TO COUNSEL. U.S. CONST. AMENDS. IV, V, XIV; N.J. CONST. ART. I, ¶¶ 1, 7, 9, 10.

POINT III: THE COURT ERRED BY PERMITTING THE STATE, OVER THE DEFENDANT'S OBJECTION, TO ELICIT FROM MR. TUNG'S INTERROGATOR IRRELEVANT AND PREJUDICIAL EXPRESSIONS OF LAY BELIEF IN MR. TUNG'S GUILT. <u>U.S. CONST.</u>, AMENDS. V, XIV; <u>N.J. CONST.</u> ART. I, ¶¶ 1, 9, 10.

POINT IV: THE COURT UNDERCUT MR. TUNG'S DEFENSE BY FAILING TO INSTRUCT THE JURY, CONSISTENT WITH THE MODEL CHARGES, (1) THAT THE IDENTITY OF THE PERSON WHO COMMITTED THE CRIME IS AN ELEMENT OF THE OFFENSE WHICH THE STATE HAS THE BURDEN OF PROVING BEYOND A REASONABLE DOUBT, AND (2) THAT THE DEFENDANT'S PRESENCE AT THE SCENE OF THE CRIME IS AN ELEMENT OF OFFENSE WHICH THE STATE HAS THE BURDEN OF PROVING BEYOND A REASONABLE DOUBT. <u>U.S. CONST.</u> AMENDS. IV, V, XIV; <u>N.J. CONST.</u> ART. I ¶¶ 1, 9, 10. (NOT RAISED BELOW).

POINT V: BECAUSE THE STATE FAILED TO MEET ITS BURDEN OF PROVING BEYOND A REASONABLE DOUBT THAT MR. TUNG WAS THE PERPETRATOR, THIS COURT SHOULD REVERSE THE DENIAL OF DEFENDANT'S MOTION FOR A JUDGEMENT OF ACQUITTAL. ALTERNATIVELY, BECAUSE OF INDIVIDUAL AND CUMULATIVE ERROR, THIS COURT SHOULD REMAND FOR A NEW TRIAL.

## V. Miranda Issue

Defendant argues that the court erred by failing to suppress his statement because the police did not "scrupulously honor" his "assertion of his right to counsel during questioning."

Brazofsky read defendant his <u>Miranda</u> rights and went over the form with him. Brazofsky explained that, in New Jersey, any time a person's name comes up in an investigation and they are questioned, that person is advised of his rights. Brazofsky stated, "You're not under arrest. You could leave any time you want. We hope that you'll cooperate with us, because the sooner we can determine whether you are or not involved in this incident . . . the quicker we get you out of here." To the question "[w]ould you be willing to sit down with us for a little while and talk with us?" defendant answered, "Yeah. If I find out what's going on, yeah."

The following exchange occurred regarding defendant's right to counsel:

> Q: Do you understand that? It basically means right now we wanna know if you would talk to us. You have the right to say no at any time. You could tell me no now. You could tell me no in ten minutes. Okay? Um, do you understand what these rights are that I read to you?
>
> A: I read the above statement of my rights, also been read aloud to me. I understand what my rights are. I

24

am now willing to answer questions without the presence of an attorney.

Q: Of an attorney.

A: That's like -- that's like giving up the right?

Q: Right.

A: I am not waiving the right.

Q: Well, what we wanna do is we wanna talk to you.

A: Okay.

Q: But if you want an attorney, we can't talk to you.

A: Well, I don't know what you guys wanna talk about, so, you know . . . .

Q: Well, I'll explain it to you.

A: Okay.

Q: Basically, what this is, if you change your mind in 30 seconds, you don't wanna talk to me anymore and you wanna get an attorney -

A: It didn't say that.

Q: - you can do it at any time.

A: It didn't say that here, though.

Q: No, it does.

A: Oh.

25

Q: It says, right now, I am now willing to answer questions without the presence of any attorney, but it says right here, you may stop answering questions or request an attorney at any time.

A: Oh, okay.

Q: And we will respect that.  Okay?

A: Okay.

Q: Um, would you be willing to talk to us, just help us (inaudible).

A: Yes, yes.  Yeah, sure.

The trial judge denied defendant's motion to suppress the statement, noting, "I think it was prudent and proper to give the <u>Miranda</u> warnings, which were done."  The judge held that defendant "knowingly and intelligently waived" his rights.  The judge found:  "[Defendant] gave a statement willingly. There was no coercion of any type.  He was given food, he was given drink, he was treated well."

On appeal, defendant argues that when he stated "I am not waiving the right," the police were obliged to immediately cease questioning until he had an opportunity to consult with counsel or, at the least, ask him to clarify what could be considered "an equivocal request for an attorney."

Our Supreme Court has held that even "an equivocal request for an attorney" cannot be disregarded. State v. Chew, 150 N.J. 30, 63 (1997). In Chew, the Court held that the defendant's request to his mother to phone his attorney, while police were escorting him out of his home, was an ambiguous invocation of the right to counsel that the police should have clarified before proceeding with the morning interrogation. Id. at 58-59, 63. The Court noted, however, that the defendant later "requested and was granted permission to call his attorney" during the interrogation at the police station. Id. at 46. A subsequent statement made that evening was admissible because the defendant had initiated the conversation and given a valid waiver of his rights. Id. at 58-59, 66.

In State v. Messino, 378 N.J. Super. 559, 573, 577-78 (App. Div. 2005), we rejected the defendant's argument that asking a police officer, "Do you think I need a lawyer?" during a break in interrogation was an ambiguous request for counsel. The officer told the defendant that he had the right to counsel and that it "was his call" whether to invoke that right. Id. at 573. We explained:

> In our view, defendant's statement to [the officer] was not a request for an attorney. Defendant merely asked the officer whether he thought defendant needed a lawyer, an inquiry that readily may be distinguished from other statements considered to be requests for counsel.

27

[Id. at 578.]

The circumstances in this case are akin to those in Messino. The exchange between Brazofsky and defendant was an additional explanation that defendant could stop the interrogation and seek counsel at any time, and it provided Brazofsky with another opportunity to assure defendant that the choice was his. Defendant's statement "I am not waiving the right" was squarely within the context of a discussion with Brazofsky of the nature and scope of defendant's rights, not an expression of a present desire for counsel. Brazofsky informed defendant that he could stop answering questions at any point he chose and seek counsel, that the Miranda form confirmed this, and that the questioning officers would respect his request. After receiving that explanation, defendant proceeded to sign the form and voluntarily answer questions. When, hours later, defendant said he wanted to "see what my attorney says" before answering any more questions, the interrogation ceased.

We affirm the trial judge's determination that defendant's choice to speak to the police without counsel present was knowing, intelligent, and voluntary.

## VI. Defendant's Invocation of Rights

Defendant contends that his conviction must be reversed because of repeated references at trial to his statements that he wished to consult with

28

counsel and refused to consent to a search of his computer or car. He argues that the admission of such references improperly encouraged the jury to make negative inferences against him because of the "invocation of his Fourth and Fifth Amendment rights." We agree.

## A. Invocation of Right to Counsel

Defendant notes that the prosecutor "played the unabridged recording" of defendant's statement, which included, at the very end, his request for counsel, and elicited additional live testimony from Brazofsky that the interview stopped when defendant stated that he would like to call his attorney. Because defendant did not object, we analyze this issue under the plain error standard. R. 2:10-2.

Plain error is an error or omission that is "clearly capable of producing an unjust result . . . ." R. 2:10-2. The possibility of an unjust result must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Melvin, 65 N.J. 1, 18-19 (1974); see also State v. Macon, 57 N.J. 325, 335 (1971) ("No matter how a test may be stated, the question whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict.").

Under State v. Feaster, 156 N.J. 1, 75-86 (1998), the trial court should either have excised these references or provided the jury with a clear limiting

instruction. In Feaster, our Supreme Court held that "trial courts should endeavor to excise any reference to a criminal defendant's invocation of his right to counsel." Id. at 75. When "testimony explaining why an interview or interrogation was terminated" is essential, "a cautionary instruction should be provided that explains to the jury that people decline to speak with police for many reasons, emphasizing that a defendant's invocation of his right to counsel or right to remain silent may not in any way be used to infer guilt." Id. at 76.

However, a trial court's failure to follow the Feaster stricture of excision or a cautionary instruction does not necessarily equate to reversible or plain error. The Feaster Court found the error of failing to excise the reference or provide a cautionary instruction was harmless due to "the fleeting nature of the reference" in testimony, the fact that the prosecutor "did not comment on the matter during summation," and the trial judge's "emphatic instruction" that defendant's failure to testify could not be held against him, which "impart[ed] to the jury the respect to be accorded defendant's decision to remain silent." Id. at 77; see also State v. Tilghman, 345 N.J. Super. 571, 576-77 (App. Div. 2001) (finding that "inviting the jury to infer guilt from the request for an attorney" was "egregious and inexcusable" and one of several "foul blows" by the prosecutor that, considered together, required reversal).

Here, the trial court neither excised the two references in the record to defendant invoking his right to counsel to end the interrogation, nor provided a cautionary instruction following a determination that inclusion of the references was necessary to avoid juror confusion. Given the longstanding standard of Feaster and the constitutional dimension of defendant's right to counsel, the trial court should have addressed this issue regardless of whether defense counsel objected. Standing alone, these references without a cautionary instruction might not constitute plain error. Combined with other errors, however, they had the clear capacity to undermine the verdict.

## B.  Refusal of Consent to Search

Defendant's audio statement included (1) defendant's response to Brazofsky that he would like to speak to his lawyer before allowing a computer search; (2) Brazofsky's subsequent entreaties to allow a computer search to prove defendant was home; (3) police comments to defendant that an innocent man would gladly consent to a search of his computer and (4) defendant's refusal to allow a car search without consulting his lawyer. The jury heard these exchanges twice, during trial and then again during deliberations. The jury also heard Brazofsky's testimony with repeated references to his unsuccessful attempts to obtain defendant's consent to the searches.

31

Defense counsel did not object to the playback, but did object to one of Brazofsky's live comments, noting that defendant had the right to object to a search of his computer. The State contends that this "single belated objection" should not be deemed an objection to all references to defendant's refusal of consent to search. Even reviewed under the plain error standard, however, Brazofsky's repeated references to defendant's refusal were improper.

No published case in New Jersey has addressed whether evidence regarding a defendant's refusal to consent to a search may be properly admitted at trial. However, federal and state courts have uniformly held that, because suspects have a constitutional right to refuse consent to a search, it is improper to allow a refusal to consent to be used at trial as evidence suggesting guilt or guilty knowledge. See United States v. Thame, 846 F.2d 200, 206-07 (3d Cir. 1988) (concluding that it was error for the prosecutor to argue in summation that the defendant's refusal to consent to a full search of his luggage at a train station was evidence of his guilt, but reversal was not required where there was considerable other evidence of his guilt); see also United States v. Prescott, 581 F.2d 1343, 1351 (9th Cir. 1978) (reversing the defendant's conviction where the trial court erroneously allowed evidence from the forcible entry and warrantless search of her apartment and holding that her refusal to consent to a warrantless

search was "privileged conduct which [could not] be considered as evidence of criminal wrongdoing").

Federal "circuit courts that have directly addressed this question have unanimously held that a defendant's refusal to consent to a warrantless search may not be presented as evidence of guilt." United States v. Runyan, 290 F.3d 223, 249 (5th Cir. 2002); accord United States v. Dozal, 173 F.3d 787, 794 (10th Cir. 1999) (noting that "asking a jury to draw adverse inferences from such a refusal may be impermissible if the testimony is not admitted as a fair response to a claim by the defendant or for some other proper purpose"); United States v. McNatt, 931 F.2d 251, 257-58 (4th Cir. 1991) (holding that evidence of the defendant's refusal to consent to search was admissible to respond to the defendant's claim that police planted evidence, not as an inference of guilt).

Likewise, various state courts have consistently held that evidence of a defendant's refusal to consent to a search is inadmissible at trial. In a sexual assault case, the defendant, on the advice of counsel, refused to voluntarily provide a DNA sample, which was ultimately obtained pursuant to a warrant. State v. Gauthier, 298 P.3d 126, 129-30 (Wash. Ct. App. 2013) (finding "manifest constitutional error" where the prosecutor argued in her closing that the defendant refused to provide a DNA sample because he was guilty). The

A-3692-15T1

Gauthier court held that "[t]he jury should not be allowed to infer guilt" from a defendant's refusal to consent to a warrantless search. Id. at 131.

The Gauthier court also rejected the argument, advanced by the State here, that "the Fourth and Fifth Amendment rights function differently," so the concerns in cases regarding the right to silence are inapplicable to a consent to search analysis. Id. at 131-32 (noting that "exercising a constitutional right is not admissible as evidence of guilt"); see also Thame, 846 F.2d at 206-07 (finding "little, if any, valid distinction between the privilege against self-incrimination and the privilege against unreasonable searches and seizures which is relevant to the propriety of the prosecutor's argument" that defendant's refusal to consent to a full search was evidence of guilt).

The analysis of this refusal-to-consent issue by other state courts is not as in-depth as in Gauthier, but typically the courts view the use of non-consent evidence as an impermissible burden on rights protected by the Fourth Amendment of the U.S. Constitution. See Padgett v. State, 590 P.2d 432, 434-35 (Alaska 1979) (noting that the Fourth Amendment right to refuse consent to a search "would be effectively destroyed if, when exercised, it could be used as evidence of guilt"); see also Longshore v. State, 924 A.2d 1129, 1159 (Md. 2007) ("An unfair and impermissible burden would be placed upon the assertion

of a constitutional right if the State could use a refusal to a warrantless search against an individual."); <u>Sampson v. State</u>, 122 P.3d 1255, 1260-61 (Nev. 2005) (holding that it was "constitutional error for a prosecutor to elicit testimony or comment on a defendant's refusal to consent to a warrantless search to support an inference of guilt"); <u>Commonwealth v. Tillery</u>, 611 A.2d 1245, 1249 (Pa. Super. Ct. 1992) (noting that the assertion of a constitutional right cannot be used to infer the presence of a guilty conscience); <u>Simmons v. State</u>, 419 S.E.2d 225, 226-27 (S.C. 1992) ("[T]he law is clearly established that the state cannot, through evidence or argument, comment upon an accused's exercise of a constitutional right.").

Some state courts have reasoned that the same principles disallowing any inference of guilt from a defendant's exercise of the right to remain silent under the Fifth Amendment apply when analyzing a refusal to consent under the Fourth Amendment. <u>See</u> <u>State v. Palenkas</u>, 933 P.2d 1269, 1279-80 (Ariz. Ct. App. 1996); <u>see also</u> <u>Mackey v. State</u>, 507 S.E.2d 482, 484 (Ga. Ct. App. 1998). Other courts have held that the admission of evidence of refusal to consent is improper because its prejudicial impact is far greater than its probative value. <u>See</u> <u>People v. Eghan</u>, 799 N.E.2d 1026, 1034-36 (Ill. 2003); <u>see also</u> <u>State v. Thomas</u>, 766 N.W.2d 263, 271 (Iowa Ct. App. 2009).

Here, the State contends that "the evidence of defendant not giving consent was admissible," citing to <u>Dozal</u> and <u>McNatt</u> as establishing that evidence of refusal to consent "is admissible where admitted for a proper purpose." However, the evidence in <u>Dozal</u> was used "not to impute guilty knowledge to [the defendant], but for the proper purpose of establishing dominion and control over the premises where a large part of the cocaine was found." <u>Dozal</u>, 173 F.3d at 794. Similarly, the evidence in <u>McNatt</u> was admissible because it plainly undercut the defense argument that the police had planted evidence. <u>McNatt</u>, 931 F.2d at 256.

No such probative value attaches here to evidence of defendant's refusal to consent. Not only did Brazofsky plainly suggest during the interrogation that an innocent man would have been glad to agree to a search and that he could not understand why defendant would want to consult an attorney before agreeing, but his live testimony suffered from the same problems. Before the statement playback began, Brazofsky told the jury he "just reinforced" that a consent search could "clear [defendant] as a suspect," but that defendant "still declined to allow us to look at the computer." As part of his commentary during pauses of the playback, Brazofsky improperly opined that defendant refused a consent

search of his computer even though, if he was innocent, it "could be beneficial" to him.

The question, then, is whether references to defendant's refusal to consent to a search was plain error. As part of this determination, a reviewing court may consider whether, absent the evidence admitted in error, there was overwhelming evidence of the defendant's guilt. See, e.g., State v. Camacho, 218 N.J. 533, 554-55 (2014) (holding that failure to give a no-adverse inference charge was harmless error because the jury was instructed that the defendant had no obligation to testify, and the State presented "overwhelming evidence" of guilt); State v. Sterling, 215 N.J. 65, 105-06 (2013) (holding erroneous joinder of cases was harmless as to the defendants against whom there was overwhelming evidence of guilt, but not as to the defendant against whom the evidence was weaker).

Here, lacking any direct evidence of defendant's presence in New Jersey on the night of the murder, the State relied on circumstantial evidence of a strong motive, a false claim of being home all night except for a trip to buy beer, as well as the timing of defendant's massive computer wipe. In these circumstances, the repeated suggestion that defendant refused consent because he knew he was guilty and had something to hide was prejudicial. The sheer

37

number of references to defendant's refusal, both in the statement and in Brazofsky's live testimony, prevents a finding that the references were fleeting or isolated.

Moreover, the court did not give a limiting instruction to the jury that it could not consider defendant's refusal to consent as evidence of guilt. The trial judge instructed the jury:

> The [S]tate introduced evidence of an audio recorded statement . . . . Neither the comments made by the detectives nor opinions expressed by the detectives constitute evidence and may not be considered by you as evidence. It is solely Sui Kam Tung's statement and responses to the questions that may be considered.

This instruction directed the jury to disregard the police comments within the audio recording, but not to disregard Brazofsky's similar comments during trial. Further, the instruction that the jury should consider defendant's responses opened the door to consideration of defendant's repeated refusals to consent as evidence that defendant had something to hide. The repeated references to defendant's refusal to consent to both a search of his car and his computer were "clearly capable of producing an unjust result." R. 2:10-2.

## VII. Witness Opinion of Defendant's Dishonesty

Defendant argues that the prosecutor elicited inadmissible testimony from Brazofsky regarding his belief in defendant's guilt. Brazofsky's testimony

conveyed to the jury that Brazofsky could tell defendant was a guilty liar, and the prosecutor reinforced this impression in closing.

Defense counsel objected that it was "an opinion of the officer" when Brazofsky testified that defendant "obviously . . . wasn't being truthful" when he answered the question as to whether S. had a boyfriend, and the trial court sustained the objection to that "characterization." On three other occasions, the trial court sustained objections to Brazofsky's comments about what defendant was thinking or "realiz[ing]" at the time. The only occasion where the trial court failed to sustain a defense objection to Brazofsky's characterization of defendant's answers occurred when Brazofsky gave an opinion that defendant's answer was "odd." Defense counsel did not object to any other statements by Brazofsky touching on defendant's guilt or veracity. Although partially raised, we review this issue under the plain error standard as well. R. 2:10-2.

Defendant contends that Brazofsky's testimony regarding defendant's demeanor, emotional state, and veracity should all have been excluded. As to a defendant's demeanor, fact witnesses are permitted to testify regarding what they "perceived through one or more of the senses." State v. McLean, 205 N.J. 438, 460 (2011). For police officers, such testimony routinely consists of "a description of what the officer did and saw." Ibid. "Testimony of that type

includes no opinion, lay or expert, and does not convey information about what the officer 'believed,' 'thought' or 'suspected,' but instead is an ordinary fact-based recitation by a witness with first-hand knowledge." Ibid. Brazofsky's descriptions of defendant's slumping forward, slouching, freezing, and staring at some points while avoiding eye contact at others fall into the category of permissible first-hand observations.

A witness may offer lay opinion testimony on an individual's emotional state if it "(a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." N.J.R.E. 701. Brazofsky's observations that defendant appeared aggravated at one point and was "clearly upset" at another were his opinions based on first-hand perception of defendant's appearance, demeanor, and reactions, which fall within the lay opinion rule.

Brazofsky's opinions as to defendant's truthfulness and guilt, however, were not admissible as either demeanor evidence or lay opinion. In McLean, 205 N.J. at 459, for example, the Court held that, while it was appropriate for a police officer to testify regarding the actions he observed, it was improper to allow the officer to opine that those actions were indicative of a narcotics transaction. Instead, "a jury's determination of criminal guilt or innocence is its

exclusive responsibility." State v. Odom, 116 N.J. 65, 77 (1989). It is "wholly improper" for a witness to opine that the defendant is guilty of the crime charged. Ibid.; see also, e.g., McLean, 205 N.J. at 461 (noting that witnesses may not "intrude on the province of the jury by offering, in the guise of opinions, views on the meaning of facts that the jury is fully able to sort out" or "express a view on the ultimate question of guilt or innocence").

Our Supreme Court has noted:

> We go to extraordinary lengths in ordinary criminal cases to preserve the integrity and neutrality of jury deliberations, to avoid inadvertently encouraging a jury prematurely to think of a defendant as guilty, to assure the complete opportunity of the jury alone to determine guilt, to prevent the court or the State from expressing an opinion of defendant's guilt, and to require the jury to determine under proper charges no matter how obvious guilt may be. A failure to abide by and honor these strictures fatally weakens the role of the jury, depriving a defendant of the right to trial by jury.
>
> [State v. Frisby, 174 N.J. 583, 594 (2002) (quoting State v. Hightower, 120 N.J. 378, 427-28 (1990) (Handler, J., concurring in part, and dissenting in part) (citations omitted)).]

Neither should a witness offer an opinion that a defendant's statement is a lie. Ibid. (noting that "the mere assessment of another witness's credibility is prohibited"). "[C]redibility is an issue which is peculiarly within the jury's ken and with respect to which ordinarily jurors require no expert assistance." State

A-3692-15T1

v. J.Q., 252 N.J. Super. 11, 39 (App. Div. 1991); see also State v. Pasterick, 285 N.J. Super. 607, 620 (App. Div. 1995) (finding plain error where the trial court allowed testimony of an expert rebuttal witness regarding defendant's truthfulness, concluding "[t]here is no provision in our legal system for a 'truth-teller' who is authorized to advise the jury on the basis of ex parte investigations what the facts are and that the defendant's story is a lie").

Police testimony concerning a defendant's guilt or veracity is particularly prejudicial because "[a] jury may be inclined to accord special respect to such a witness," and where that witness's testimony goes "to the heart of the case," deference by the jury could lead it to "ascribe[] almost determinative significance to [the officer's] opinion." Neno v. Clinton 167 N.J. 573, 586-87 (2001); see also Frisby, 174 N.J. at 595 (noting that "[t]he effect of the police testimony essentially vouching for" the version of events contrary to defendant "cannot be overstated").

Here, Brazofsky's improper testimony covered three areas: (1) an unsolicited remark that, by the time he was questioning defendant on March 7, 2011, defendant had been to Cantor's home "[f]our times," meaning the three visits substantiated by other witnesses and a fourth visit to murder Cantor; (2)

testimony regarding defendant's silences; and (3) opinion that defendant's answers were untruthful, "evasive," "vague" and "odd."

The jury charge, which included a general instruction to disregard the officers' "comments" during defendant's interrogation, was inadequate to address the multiplicity of times during the playback when the officers expressly stated they knew defendant was lying and firmly believed in his guilt. While the judge sustained an objection to Brazofsky's characterization that "obviously [defendant] wasn't being truthful," he allowed the admission of other testimony regarding Brazofsky's personal belief that defendant was a liar.

Most troubling is that Brazofsky frequently made comments on the manner in which defendant gave responses, suggesting that Brazofsky's own experience and specialized training enabled him to determine that defendant was lying. Brazofsky told the jury: "I'm also assigned to the polygraph unit since 2005. I'm one of three polygraph examiners for the office. We conduct criminal-specific polygraph examinations for local towns, the county prosecutor's office and state and other agencies."

The jury heard Brazofsky repeatedly tell defendant that he had truth-telling skills. During his live testimony, Brazofsky stressed to the jury that, when asked if evidence would surface showing that defendant went to New

A-3692-15T1

Jersey, defendant's responses were "vague" but "not denials," while an honest person would have answered "no, absolutely not, I was home all night, you won't see me on any camera or anywhere else."

The overall message from this evidence was that Brazofsky could tell that defendant was lying about not leaving Manhattan on the night of the murder. The absence of a video recording of the interrogation exacerbated the problem presented by Brazofsky's opinion of defendant's veracity. The jury had no other source to learn how defendant was acting during the interview, causing greater danger that the jury placed reliance on Brazofsky's truth-telling expertise, rather than making its own credibility determinations.

Further, the prosecutor's statements during closing that Brazofsky's testimony established "what truth sounds like," and defendant "must be guilty" because he "lied" to the police invited the jury to give weight to Brazofsky's veracity opinion. Independent video evidence showed that defendant was not truthful about only leaving his apartment once to buy beer. But the jury's evaluation of whether his denial of guilt was credible was tainted by Brazofsky's clearly and repeatedly stated opinion. When combined with other errors, this deprived defendant of a fair trial. See State v. Jenewicz, 193 N.J. 440, 473-74 (2008).

44

## VIII. Jury Charge

Because we reverse and remand for further proceedings on other grounds, we need not discuss the jury charge at length. Defendant argues that the trial court's failure to include, sua sponte, the model jury charges on identification and alibi was plain error. We reject this argument.

The model jury charge on identification that defendant references was not approved until October 26, 2015, over a month after trial had begun. In addition, eyewitness identification was not at issue in this case, so many of the concerns raised in the cases and addressed in the model jury charges do not apply. See State v. Henderson, 208 N.J. 208, 245 (2011).

Defendant did not raise an alibi defense. Moreover, in arguing that he was entitled to an alibi charge, defendant ignores our longstanding Supreme Court precedent establishing that, while charging the jury as to alibi might be useful, it is hardly necessary in every case where the defendant claims to have been elsewhere at the time of the crime. State v. Garvin, 44 N.J. 268, 271-75 (1965); see also State v. Peetros, 45 N.J. 540, 543-45 (1965) (finding an alibi charge unnecessary when "[t]he court's charge correctly described the State's burden to prove guilt beyond a reasonable doubt, requiring an acquittal if a reasonable doubt remained after a consideration of 'all the evidence' in the case").

The charge given correctly advised the jury that the State was obliged to prove beyond a reasonable doubt that defendant was the perpetrator, including proving that defendant was in Cantor's home in Teaneck on the night of the murder.

Defendant's argument that the court should have granted his motion for a judgment of acquittal at the conclusion of the State's case is without sufficient merit to require discussion here. R. 2:11-3(e)(2).

The admission of evidence concerning defendant's exercise of his right to counsel and his right to refuse a search was error. The testimony of a detective, who the jury knew had administered lie detector tests for ten years, that defendant was not truthful was improper. The cumulative error deprived defendant of a fair trial.

We reverse and remand for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3692-15T1