**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5070-17T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SAMUEL RUA, 3RD,
a/k/a SAMUEL P. RUA, III,
and SAMUEL RYA,

    Defendant-Appellant.

_____

Argued November 2, 2020 - Decided January 11, 2021

Before Judges Sabatino, Currier, and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 16-05-0482.

Stephen F. Payerle, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Dayne R. Johnson, on the briefs).

Ali Y. Ozbek, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Ali Y. Ozbek, of counsel and on the brief).

PER CURIAM

Defendant Samuel Rua, III, appeals from his convictions and sentence following a jury trial. He alleges various evidentiary errors regarding the State's presentation of surveillance videos, and the video of defendant's interrogation. He also challenges certain statements as inadmissible hearsay and contends the prosecutor made improper remarks during closing arguments. In addition, defendant asserts his sentence was excessive and unduly punitive. We affirm.

I.

Defendant was charged in an indictment with: (1) first-degree murder, N.J.S.A. 2C:11-3(a)(1) or N.J.S.A. 2C:11-3(a)(2) (count one); (2) first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count two); (3) first-degree robbery, N.J.S.A. 2C:15-1(a)(1) and/or N.J.S.A. 2C:15-1(a)(2) and/or N.J.S.A. 2C:15-1(a)(3) (count three); (4) third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count four); (5) fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count five); (6) fourth-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(a) (count six); (7) third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count seven); (8) fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count eight); (9) third-degree possession of a weapon for an

unlawful purpose, N.J.S.A. 2C:39-4(d) (count nine); (10) fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count ten); (11) fourth-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(a) (count eleven); and (12) fourth-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(a) (count twelve).

## A.

We derive the facts from the evidence elicited at trial. On April 26, 2015, at approximately 9:45 a.m., Paterson police officers discovered the body of seventeen-year-old Nadjhier Barner-Timmons (Nadjhier) on the railroad tracks at the corner of East 26th Street and 18th Avenue in Paterson. This area of the tracks and the surrounding streets were known for prostitution activity, drugs, and other crimes.

Nadjhier's body was found in "high weeds" in an area strewn with garbage and other debris, including "house furniture, broken bottles, [and] needles." Officers discovered a blood trail and markings in the soil which suggested Nadjhier's body had been dragged from a nearby location and placed in the weeds.

Nadjhier was wearing a bloody t-shirt and khaki pants that had been pulled down. He had two stab wounds on his chest, one of which was fatal, as well as

a shallow cut on his back. The officers retrieved a Trojan Magnum condom and cell phone charging cord from the scene.

After police identified Nadjhier, they spoke to his family and obtained a photograph of him. That night, several officers performed a roving canvas of the area surrounding the crime scene, hoping to locate further evidence. This entailed "driving around . . . or walking trying to talk to people . . . [and] find evidence." As part of the detail, Detective Jack DeSalvo stopped on Market Street in Paterson and showed Nadjhier's picture to a group of prostitutes. A female prostitute told DeSalvo that Nadjhier was a prostitute and she had previously seen him in the back of the Trinity Press building. A male prostitute informed DeSalvo that he had seen Nadjhier around the Trinity Press building, located on Market Street, at approximately 8:00 p.m. the prior evening, April 25.

As a result of this information, the Passaic County Prosecutor's Office obtained sixteen surveillance videotapes from Trinity Press and other businesses and homes in the area. The video footage was reviewed by DeSalvo, Detective Abdul Hamdeh, and other individuals from the prosecutor's office.

During trial, Hamdeh used the surveillance video footage to create a timeline of defendant's and Nadjhier's movements on the evening of April 25.

He described how the tapes were collected and told the jury he had spent numerous hours reviewing the footage. Hamdeh also explained that some of the time stamps on the tapes were inaccurate due to the different recording systems used for each video. The detective further discussed how he used the clock on his cell phone as a baseline to determine whether each video was accurately time stamped.

Hamdeh began with the Trinity Press footage. He identified Nadjhier on the tape, walking up and down 19th Avenue between East 25th and 26th Street from 8:28 p.m. to 9:26 p.m. Hamdeh testified he was able to identify Nadjhier based on the clothes he was wearing—khaki pants, a black hooded sweatshirt, and sneakers.

During the review of these surveillance videos, the officers saw an individual, later identified as defendant, walking with Nadjhier towards the railroad tracks and entering them. When the individual left the tracks area approximately three minutes later, he was alone. The detectives saw this same individual on numerous surveillance tapes from several residences and businesses. They described the individual as wearing a sweatshirt bearing an

eagle logo,[1] having a long ponytail, a spiderweb neck tattoo, and noted he had a "specific" walk from the surveillance footage. The detectives said defendant's walk was distinctive because his left arm remained stationary at his side or in his pocket and did not "sway."

During the evening of May 9, 2015, DeSalvo and another officer were driving along East 26th Street between Market Street and 19th Avenue as part of the roving canvas when they observed a person walking towards them that they immediately recognized as the man with Nadjhier on the video surveillance footage.[2] DeSalvo was able to identify defendant because of his ponytail, neck tattoo, and specific walk. DeSalvo got out of the car and identified himself as a police officer. When he observed a folding pocketknife in defendant's right hand, DeSalvo handcuffed and detained him. During a search, DeSalvo discovered cloth gloves, a pocketknife, a kitchen steak knife, an eight-inch metal pipe inside of a sock, and an unopened Trojan Magnum condom.

---

[1] DeSalvo testified at trial that officers recovered this same sweatshirt when they executed a search warrant at defendant's residence on May 10, 2015.

[2] DeSalvo testified this was very close to the area where Nadjhier's body was discovered.

A-5070-17T1

After defendant's arrest, DeSalvo and another detective took him to police headquarters for interrogation. The interrogation was recorded. The detectives read defendant his Miranda[3] rights before the interrogation and defendant signed a form indicating he understood his rights and agreed to waive them.

Defendant informed the detectives that he worked in Paterson. He admitted he had visited Market Street and the surrounding area to solicit prostitutes on at least three occasions.

The detectives informed defendant that security camera footage revealed he was on the tracks on the night of April 25:

> [DETECTIVE DESALVO]: Well there was an incident on the tracks.
>
> [DEFENDANT]: All right.
>
> [DETECTIVE DESALVO]: And you're seen on the tracks.
>
> [DEFENDANT]: I'm seen on the tracks?
>
> [DETECTIVE DESALVO]: Yeah.
>
> [DEFENDANT]: All right.

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

Defendant asked the detectives whether they were "sure they got the right guy." DeSalvo responded that he was "[one] hundred percent sure[]" because the "whole [c]ity's camera'd up[]" and "[he] clearly [saw] [defendant]." Defendant responded: "I mean I'm not going to deny it. I – on the tracks. I mean I walked down the tracks and everything looking for the bitches[.]"

The detectives then questioned defendant about a cut on his hand which they had observed on the surveillance footage. Defendant stated he had cut his hand at work several weeks earlier. DeSalvo informed defendant that surveillance footage taken inside a liquor store on April 25 showed defendant bleeding profusely from his hand.

The detectives continued to ask defendant what transpired on the tracks that night. When defendant did not answer, DeSalvo informed defendant that the surveillance footage showed defendant "walking on the tracks with somebody . . . [c]lear as day[,]" leaving by himself, and then returning to the tracks fifty minutes later. Defendant responded that a "crack head" who looked "Spanish[]" approached him on the tracks. DeSalvo stated that surveillance footage put defendant "on the tracks with a black kid."

Shortly thereafter, defendant invoked his right to counsel:

> [DEFENDANT]: I think I should get need a lawyer. I
> mean, --

[DETECTIVE DESALVO]: That's – (indiscernible).

[DEFENDANT]: (Indiscernible).

[DETECTIVE DESALVO]: Is that what you want?

[DEFENDANT]: Yeah.  I think I need a lawyer.

[DETECTIVE DESALVO]: Okay.

[DEFENDANT]: Because I don't think I said anything -- (indiscernible).

[DETECTIVE DESALVO]: Okay.  If you say it, it's over.  (indiscernible).

The detectives then immediately terminated the interrogation.

On the first day of trial, the State introduced and played defendant's recorded interrogation for the jury.  The tape included defendant's invocation of counsel.  Defense counsel did not object to the introduction of the video.  After the video ended, the judge dismissed the jury for a lunch break.

As soon as the jurors returned from lunch, the court gave them the following instruction:

> [Defendant's recorded interrogation] was played for you.  As you may recall, the interview of the defendant with the Paterson Detectives ended after the defendant invoked his constitutional right to an attorney.  The fact that the defendant invoked his constitutional right to an attorney should play no role in your deliberation.  Which means the fact that he raised an issue – he invoked his right -- constitutional right to an attorney

> should in no way be considered by you during your deliberations.

The record does not reflect that anyone requested the instruction.

As stated, the detectives first identified a suspect, later identified as defendant, when they saw a man on surveillance footage walking down the street and entering the tracks with Nadjhier but then returning alone from the area three minutes later. The two were seen walking together towards the tracks on numerous camera feeds from businesses and residences in the area. The camera from a business located on East 25th Street pointed directly onto the railroad tracks. Its video footage showed defendant and Nadjhier walking down the tracks towards East 26th Street. It is the last one Nadjhier appears on. Approximately fifty minutes later, surveillance footage from two businesses showed defendant reentering the tracks and returning to the area where Nadjhier's body was later found.

Additional video tapes showed defendant exiting the tracks and walking up East 27th Street towards Market Street with a black sweatshirt in his hand. As defendant turned onto Market Street, footage from several businesses showed him throwing something into a garbage can and continuing down the street – now with empty hands.

A-5070-17T1

The video footage depicts defendant crossing Market Street, making a right turn onto Trenton Avenue and entering a liquor store at the intersection of 21st and Trenton Avenues. In the liquor store footage, defendant is seen making a purchase and then giving money or another item to an individual outside the store. Defendant's features and clothing are clearly seen in this piece of tape – including a tattoo on his neck, his hair in a ponytail, and he is wearing a sweatshirt with an eagle logo. The detectives also observed a cut on defendant's right hand which was bleeding. After defendant left the store, he was not seen on video again.

In his closing argument, the prosecutor acknowledged that the State's case relied upon circumstantial evidence, stating there was no direct evidence. Nevertheless, the prosecutor asserted there was sufficient circumstantial evidence to permit the jury to find defendant guilty. The prosecutor asked the jury to focus on the "puzzle pieces" he had presented, use their "common sense" and not to be distracted by defense counsel's "fancy words."

As he detailed the State's efforts to construct a timeline showing defendant's and Nadjhier's movements on the night of the murder, the prosecutor mentioned Detective DeSalvo's conversation with the prostitutes on Market Street during the roving canvas, referring to the prostitutes as "witnesses." The

11

prosecutor explained how one prostitute's statement – that he had seen Nadjhier near Trinity Press – led officers to uncover surveillance videos from that location and other nearby businesses and residences. The prosecutor described how the videos permitted the State to establish a timeline showing "where Nadjhier was when he was last alive and . . . his final steps[,] as well as who he was with when he was taking those final steps." The prosecutor contended the circumstantial evidence showed Nadjhier died between 10:00 p.m. and 11:00 p.m. on April 25.

The prosecutor further suggested the jury could infer defendant was familiar with both the area and the people working in the area because he went there "often" to solicit prostitutes. The prosecutor remarked that defendant and Nadjhier were familiar with one another because of the "quick[ness]" with which Nadjhier walked with defendant towards the railroad tracks. The prosecutor asserted Nadjhier's "willing[ness]" to accompany defendant created a "probability" of knowledge from prior contact.

The prosecutor concluded by stating:

> You have all this evidence before you. You have everything that you can take to consider all of this, everything.
>
> Nadjhier Timmons was 17 years old. Yes, he might have been a prostitute and we've all made mistakes at

17. I know I have. We've all messed up. We all grew up from that. The difference between us and Nadjhier is Nadjhier will never get that opportunity.

Ladies and gentlemen, we selected you through a painstaking process. It's been almost a month that we've had you here. You've paid attention throughout the entirety of this trial and we thank you, as the State, but now the most important functions comes (sic) when you will deliberate and I submit to you, based – when you take everything into consideration, everything that was presented before you, there will be no doubt that this defendant is guilty of the crime for which he is charged and that is the murder of Nadjhier . . . .

Following the close of the State's case, the court granted defendant's directed verdict and dismissed counts two and three. The jury convicted defendant of counts one, four, five, seven, eight, nine, and ten. The State dismissed counts six, eleven, and twelve.

B.

Prior to sentencing, the State moved for an extended term under N.J.S.A. 2C:43-7.1(a) and N.J.S.A. 2C:44-3(a). Although the judge agreed that defendant was eligible for an extended term as a persistent offender, he denied the motion because of insufficient notice to defendant under which count or counts the extended term was sought.

During the sentencing hearing, the judge first considered aggravating factor number one, N.J.S.A. 2C:44-1(a)(1), the nature and circumstances of the

13

offense. In detailing defendant's "purposeful and callous actions" in committing a murder that was "cold[,] planned, calculated . . . [and] carried out with [a] shocking attention to detail[,]" the judge found defendant's actions "went beyond the elements of the crime of murder in our law." Therefore, he found aggravating factor one applicable to defendant and gave it "considerable weight." However, the judge made it "abundantly clear" that the sentence he imposed would have been the same without this aggravating factor.

The judge found aggravating factor three, the risk that defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3), applicable, noting defendant's "extensive, and deterrable, prior criminal record, that began at age [thirteen] as a juvenile, and lasted for approximately [twenty] years . . . until this incident."[4] The court concluded that defendant presented a "very strong risk of committing another offense," and thus afforded aggravating factor three "great and substantial weight."

The court also considered defendant's extensive criminal record in applying aggravating factor number six, the extent of defendant's prior criminal record and the seriousness of the offenses of which he has been convicted,

---

[4] Defendant's criminal history included twenty-six prior arrests and four reported indictable convictions.

N.J.S.A. 2C:44-1(a)(6). The judge noted defendant's crimes had "grown in severity over time." The judge also found aggravating factor nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9), applicable. He "afforded this factor great[] weight." The judge found no applicable mitigating factors.

Defendant was sentenced to a life term on the first-degree murder charge subject to a sixty-three year and nine-month parole disqualifier under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, as well as concurrent sentences on the additional charges.

## II.

On appeal, defendant raises the following issues:

> I. THE ADMISSION OF POLICE STATEMENTS CONCLUDING OR OPINING ON DEFENDANT'S GUILT CONSTITUTED REVERSIBLE ERROR
>
> A. STATEMENTS DURING INTERROGATION VIDEO
>
> B. POLICE DETECTIVES' NARRATION OF THE SURVEILLANCE VIDEOS
>
> II. PERMITTING THE STATE TO PRESENT THE JURY WITH [DEFENDANT]'S INVOCATION OF HIS CONSTITUTIONAL RIGHT TO COUNSEL WAS PREJUDICIAL ERROR (NOT RAISED BELOW)

15

III.   THE TRIAL COURT ERRED BY ADMITTING VIDEO EVIDENCE THAT WAS NOT PROPERLY AUTHENTICATED

IV.   THE PROSECUTOR'S IMPROPER COMMENTS IN SUMMATION PREJUDICED DEFENDANT AND REQUIRE A NEW TRIAL

V.   DEFENDANT WAS DENIED HIS RIGHT OF CONFRONTATION UNDER THE STATE AND FEDERAL CONSTITUTIONS BY THE ADMISSION INTO EVIDENCE OF TESTIMONIAL AND HEARSAY EVIDENCE OF A NON-TESTIFYING WITNESS

VI.   BECAUSE OF INDIVIDUAL AND CUMULATIVE ERROR, THIS COURT SHOULD REMAND FOR A NEW TRIAL

VII.   THE SENTENCE IMPOSED WAS EXCESSIVE, UNDULY PUNITIVE, AND MUST THEREFORE BE REDUCED

A.

Defendant contends the trial court erred by permitting the detectives to testify as to defendant's guilt. He asserts two categories of improper testimony: (1) Detective DeSalvo's "repeated accusations of guilt" during defendant's interrogation; and (2) DeSalvo's and Hamdeh's narration of the surveillance videos. For the following reasons, we find no abuse of discretion in the admission of the testimony.

16

We initially consider defendant's allegations regarding the detectives' interrogation of him. He contends that DeSalvo made four improper statements during the questioning: (1) when he told defendant on two occasions that surveillance video footage showed him on the tracks; (2) when defendant asked DeSalvo if he was "sure you got the right guy[]," DeSalvo responded: "One hundred percent sure . . . I don't know if you notice from working in Paterson, the whole [c]ity is camera'd up;" and (3) when DeSalvo said: "[W]e see you walking on the tracks with somebody . . . [c]lear as day . . . You went on the tracks[,] . . . left by yourself[,] . . . later[] you come back on those tracks[,] [a]nd then you flee that area."

Defendant contends these statements are similar to statements this court deemed harmful error in the recent case of State v. Sui Kam Tung, 460 N.J. Super. 75 (App. Div. 2019). In Sui Kam Tung, a recording of the defendant's interrogation was played during trial after the interrogating officer told the jury of his belief that the defendant was lying in the video and was guilty of the charged crime. Id. at 87-89, 102 (officer told the defendant during the interrogation that he was assigned to the "polygraph unit" for the past ten years, opining the "defendant obviously . . . wasn't being truthful[,]" and "expressly stating" he "firmly believed in [defendant's] guilt"). We held it was error to

admit the testimony because the officer's testimony suggested his experience and specialized training enabled him to determine that the defendant was lying. Id. at 103.

Here, defendant did not object to the admission of the interrogation recording at trial. Therefore, we review for plain error. Brenman v. Demello, 191 N.J. 18, 31 (2007). Defendant must show the admission of the statements constituted error "clearly capable of producing an unjust result[,]" Rule 2:10-2, and that the error "raise[d] a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

The disputed testimony here is distinguishable from that presented in Sui Kam Tung. Detective DeSalvo did not make any statements during the interrogation or before the jury accusing defendant of lying nor did he express an opinion as to defendant's guilt. Rather, he informed defendant during the interrogation of what the surveillance footage portrayed—defendant walking with Nadjhier to the railroad tracks, leaving the tracks area by himself, and later returning to the tracks. These statements did not express DeSalvo's beliefs regarding the truthfulness of defendant's statements or of defendant's guilt. We discern no error in the admission of the interrogation recording.

B.

We turn to defendant's contentions of error regarding the introduction of the surveillance footage. He asserts that the detectives presented impermissible lay testimony during their narration of the surveillance videos. Although defendant contends his counsel "objected repeatedly" to the admission of the surveillance footage, the record reveals an objection to only one of the sixteen videos. And the objection was to the foundation and condition of the video – not to Detective Hamdeh's testimony.[5] Therefore, we review for plain error.

Lay opinion testimony is "only admitted if it falls within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function." State v. McLean, 205 N.J. 438, 456 (2011). With regard to the first requirement, "perception[] . . . rests on the

---

[5] Defense counsel argued that Hamdeh did not establish a foundation for the video's time stamp and that the video was too dark for anyone to identify the person seen walking in it. We agree with defendant's description of the video. Although an individual wearing dark clothing can be seen walking along the railroad tracks towards East 27th Street, one cannot identify any distinguishing characteristics. The trial judge, however, overruled the objection, noting each juror was free to determine whether the individual in the video was defendant, and finding counsel's objection went to the "weight of the testimony not the admissibility." Whether this piece of footage was admitted in error has no bearing because, as stated, defendant was seen on multiple camera feeds coming out of the railroad tracks alone and later returning to the area.

acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." Id. at 456-57 (citing State v. LaBrutto, 114 N.J. 187, 199-200 (1989)). "The second requirement . . . is that it is limited to testimony that will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." Id. at 458.

"[P]olice officers [are permitted] to testify as lay witnesses, based on their personal observations and their long experience in areas where expert testimony might otherwise be deemed necessary." LaBrutto, 114 N.J. at 198. However, to be admissible, such lay opinion testimony "must be[] firmly rooted in the personal observations and perceptions of the lay witness in the traditional meaning of . . . [N.J.R.E.] 701." McLean, 205 N.J. at 459.

Prior to showing the surveillance footage, Detective Hamdeh told the jury how he and others from the prosecutor's office canvassed the area around the murder scene for surveillance cameras, and that he was the "primary detective" personally responsible for reviewing the videos and spent "hours upon hours" doing so. He also explained why certain time stamps on videos were inaccurate and how he calculated the proper time. Hamdeh also described for the jury that he was able to recognize defendant because of certain "distinct" features seen on the individual with Nadjhier in the videos.

In his testimony, Hamdeh only told the jury what the videos showed. He did not proffer his opinion as to what the jurors should ultimately conclude regarding defendant's guilt or innocence. From his extensive review of the videos, Hamdeh was able to provide the jury with precise times that defendant and Nadjhier came into the camera's view, where they were coming from, and where they were going. This testimony was helpful to the jury's understanding of the State's proposed timeline of the events on the evening of April 25, 2015.

Defendant contends that Hamdeh's testimony told "the jury what it should conclude from the videos[.]" We disagree. His testimony presented circumstantial evidence to the jury, from which it was permitted to draw reasonable inferences. Each juror was free to determine whether Hamdeh's description of a particular video's footage accurately reflected what the juror saw on the screen and whether the individual in a video was defendant. Hamdeh's testimony was helpful in establishing for the jury how the detectives concluded defendant was the suspect in Nadjhier's murder. It was the jury's province to determine whether they agreed or not. We discern no error here in the detective's narration of the surveillance footage.

C.

We also reject defendant's contention that the court erred in admitting the surveillance videos into evidence without proper authentication. He asserts that Detective Hamdeh could not authenticate the videos because he did not personally witness the events depicted on them.

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims. See R. 901. "This burden was not designed to be onerous." State v. Hockett, 443 N.J. Super 605, 613 (App. Div. 2016). "Once a prima facie showing is made, the [evidence] is admissible, and the ultimate question of authenticity is left to the jury." State v. Mays, 321 N.J. Super. 619, 628 (App. Div. 1999).

In the context of photographic or videographic evidence, a prima facie showing of authenticity requires "proof that the [video] is a substantially correct representation of the matters . . . offered in evidence." State v. Wilson, 135 N.J. 4, 14 (1994) (holding "[i]n practical terms, the authentication of a videotape is a direct offshoot of the authentication of photographic . . . evidence"). The "testimony offered must establish: (1) the video is an accurate reproduction of what it purports to display; and (2) the reproduction is of the location at the time

22

of the relevant incident." Id. at 15. "The person testifying need not be the [videographer][;] . . . any person with the requisite knowledge of the facts represented in the videotape may authenticate it." Id. at 14. Moreover, "the individual need not even have been present at the time the video was recorded, so long as the witness can verify that the [video] accurately represents its subject." Ibid. (citations omitted).

The surveillance videos were introduced through the testimony of Detective Hamdeh. He told the jury how he canvassed the area around the murder scene to obtain the videos from businesses and residential homes. He then spent many hours personally reviewing each video. A review of Hamdeh's testimony reveals he describes the videos with candor, conceding when distinct features of an individual could not be discerned, a video was blurry, or only shadows could be seen.

We are satisfied his testimony effectively established a prima facie showing of the surveillance videos' authenticity. His testimony established both that the videos were an accurate reproduction of what they purported to display, and that they were taken from the location at the time of the relevant events.

The detective also offered a reasonable explanation to the jury for the time stamp variances, stating it was because each video used a different recording

system. He described for the jury how he used his cell phone clock as a baseline to calculate how fast or slow a particular video was. There was no error in the admission of the videos. The jury was properly left to the task of assessing the weight of the evidence.

D.

As stated, during the interrogation, defendant invoked his right to counsel. The detectives properly terminated the questioning. However, when the recorded interrogation was played for the jury, it included the portion of the tape where defendant stated he wanted to consult with a lawyer. Defense counsel did not object to the recording and did not ask for a curative or limiting instruction. On appeal, defendant asserts it was highly prejudicial and plain error for the jury to hear that portion of the recording. We disagree.

Immediately following the conclusion of the playing of the interrogation, the judge dismissed the jury for a lunch break. When the jury returned to the courtroom, the judge, apparently sua sponte, gave the jury the instruction set forth above – directing that defendant's invocation of his constitutional right to an attorney should not be considered by them in any way in their deliberations. We are satisfied that the brevity of the reference in the interrogation recording along with the judge's timely instruction negated any error that might have

24

occurred from the failure to excise the objectionable portion of the tape. See Sui Kam Tung, 460 N.J. Super. at 95 (finding court's failure to excise defendant's invocation of right to counsel "might not constitute plain error[]" even without cautionary instruction absent other errors with the "clear capacity to undermine the verdict"). Also, jurors are presumed to obey a judge's instructions. See State v. Loftin, 146 N.J. 295, 390 (1996).

E.

We briefly address defendant's contention that the trial court erred in permitting DeSalvo to testify about information he learned from prostitutes who he spoke to during his investigation. Defendant asserts his constitutional right to confrontation was violated because the prostitutes were not called as witnesses at trial.

A defendant's right to confrontation is generally implicated when "a witness refers to specific information from a non-testifying third party." State v. Weaver, 219 N.J. 131, 152 (2014). This also applies in circumstances where a witness implies the possession of "superior knowledge, outside the record, that incriminates the defendant." State v. Branch, 182 N.J. 338, 351 (2005) (citations omitted).

However, our Supreme Court has found it permissible for a police officer to testify about "the course of [the] investigation" and the reasons for approaching a suspect or investigating a crime scene when explaining it was done "upon information received." State v. Frisby, 174 N.J. 583, 592 (2002) (citing State v. Roach, 146 N.J. 208, 224-25 (1996)); State v Bankston, 63 N.J. 263, 268 (1973) (citation omitted). Such an explanation is admissible for the sole purpose of showing that "the officer was not acting in an arbitrary manner or to explain his subsequent conduct." Bankston, 63 N.J. at 268 (citation omitted).

Here, because defendant did not object to this testimony at trial, we review for plain error and find none. The prostitutes did not offer any evidence regarding defendant's guilt. One confirmed Nadjhier was a prostitute working in the area and a second informed DeSalvo he had seen Nadjhier near the Trinity Press building on the evening of April 25, 2015. Moreover, the information given to DeSalvo was corroborated in the surveillance videos. Therefore, defendant has not established plain error in the brief reference to the prostitutes' out-of-court statements.

We turn next to defendant's assertions of error in the prosecutor's closing argument. He contends the prosecutor improperly: (1) asserted facts not established by the evidence; (2) disparaged defense counsel's arguments; and (3) improperly appealed to the jury's emotions. As defendant did not object to the closing arguments, we review for plain error. Brenman, 191 N.J. at 31.

It is clearly established that a prosecutor "may not advance improper arguments." State v. Lazo, 209 N.J. 9, 29 (2012). "It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." State v. Frost, 158 N.J. 76, 83 (1999) (citation omitted). However, "prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries" and are therefore "afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." Id. at 82. In other words, there is no error as long as the prosecutor "stays within the evidence and the legitimate inferences therefrom." State v. R.B., 183 N.J. 308, 330 (2005) (quoting State v. Mayberry, 52 N.J. 413, 437 (1968)). In addition, a prosecutor may vigorously rebut specific arguments made by defense counsel. Id. at 329-32.

Defendant contends the following assertions made by the prosecutor were not established by the evidence: (1) referring to prostitutes who spoke with the Paterson detectives as witnesses, although none of them testified at trial; (2) telling the jury that he knew and had established through the surveillance videos the last moments of the victim's life; (3) stating that defendant "sought the services of prostitutes often," despite the evidence only establishing defendant had done so three times; (4) claiming that Nadjhier and defendant must have had a prior relationship or some form of familiarity with each other because the surveillance videos showed them in the same area; (5) stating that defendant must have been familiar with Nadjhier based on the unestablished premise that he solicited prostitutes every day in the area where his body was found.

We see no impropriety in the prosecutor's comments. They were permissible argument as legitimate inferences that could be made from the facts in evidence. Defendant has not demonstrated that the comments were error clearly capable of producing an unjust result. See R. 2:10-2.

Defendant's remaining contentions regarding the State's closing argument similarly lack merit. The prosecutor was not disparaging defense counsel's motives when he told the jury not to be swayed by "fancy talk." And he was not inflaming the jury when he commented on Nadjhier's lifestyle. The prosecutor

was responding to defense counsel's closing remarks in which he referred to Nadjhier as a "homeless sexual prostitute . . . waiting to sell his own body." Defendant has not established these statements led the jury to render a verdict it might not have otherwise reached. Lazo, 209 N.J. at 26.

## G.

In challenging his sentence, defendant argues the trial court abused its discretion by "improperly weighing the aggravating and mitigating sentencing factors" in imposing a life sentence for the first-degree murder charge. Defendant contends the application of aggravating factor one, N.J.S.A. 2C:44-1(a)(1), was error as the evidence did not show the crime was "especially heinous, cruel, [or] depraved," and its application was impermissible double counting.

Our review of a trial court's sentencing decision is limited to "clear abuses of discretion." State v. Roth, 95 N.J. 334, 363 (1984). A trial court's decision is afforded such deference so long as the court "identifies the relevant aggravating and mitigating factors, determines which factors [were] supported by a preponderance of evidence, balances the relevant factors, and explains how it arrives at the appropriate sentence." State v. O'Donnell, 117 N.J. 210, 215 (1989) (citations omitted).

Whether a sentence should "gravitate toward the upper or lower end of the range depends on a balancing of the relevant factors." State v. Fuentes, 217 N.J. 57, 72 (2014). "[W]hen the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend toward the higher end of the range." Id. at 73. Impermissible double counting occurs when a sentencing court finds an aggravating factor premised solely on an essential element of the crime for which defendant was convicted. State v. Kromphold, 162 N.J. 345, 353 (2000). However, if a defendant's conduct is extreme, a sentencing court may consider that in the sentencing analysis. Fuentes, 217 N.J. at 75.

In determining the applicability of aggravating factor one, the trial judge found defendant's actions were "cold[,] planned, calculated . . . [and] carried out with [a] shocking attention to detail." He described defendant's "callous attitude [and] disregard for the life of a human being," finding the calculated nature of defendant's plan was evidenced by defendant's "calm and collected demeanor" throughout the night of the murder. We discern no error in the court's imposition of aggravating factor one. Nevertheless, even if it was error, the judge made it clear he would have imposed the same sentence without relying on this factor.

The judge also found and gave great weight to aggravating factors three and six, based on defendant's extensive criminal record consisting of twenty-six prior arrests and four reported indictable convictions which had "grown in severity over time." N.J.S.A. 2C: 2C:44-1(a)(3); N.J.S.A. 2C: 2C:44-1(a)(6). Furthermore, the court found aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), was applicable to defendant given his commission of "the most serious crime under our criminal code . . . show[ing] complete disregard to the danger and harm this action posed to others." The judge did not find any mitigating factors to be applicable.

We are satisfied that the judge's findings were supported by the evidence and there was no clear abuse of discretion. Roth, 95 N.J. at 363. Any remaining arguments not addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

31

A-5070-17T1