**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0019-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DARRYL WATSON, a/k/a
DARRYL J. WATSON,

    Defendant-Appellant.

_____

Submitted February 3, 2026 – Decided April 10, 2026

Before Judges Gilson, Perez Friscia, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment Nos. 19-05-1270 and 19-05-1271.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Marcia Blum, Assistant Deputy Public Defender, of counsel and on the brief).

Theodore N. Stephens II, Essex County Prosecutor, attorney for respondent (Shep A. Gerszberg, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Late in the afternoon of February 7, 2019, F.S. (Frank) was shot and killed while in the courtyard of a housing complex in Newark.[1] A witness testified that she was in the courtyard at the time of the shooting. The shooting was also captured on video footage from a surveillance camera.

The eyewitness testified that she knew defendant Darryl Watson, had spoken to him just before the shooting, saw defendant speaking with Frank, heard multiple gun shots, saw defendant with a gun, and saw defendant run away as Frank lay on the ground. When shown the video footage that captured the shooting, the witness testified the video showed defendant shooting Frank.

A jury convicted defendant of the first-degree murder of Frank, in violation of N.J.S.A. 2C:11-3(a)(1). The jury also convicted defendant of several related weapons and illegal drugs offenses. In a separate trial, the jury convicted defendant of being a certain person not allowed to have a weapon because of a prior criminal conviction, N.J.S.A. 2C:39-7(b)(1). In aggregate, defendant was sentenced to seventy years in prison, with periods of parole ineligibility and supervision as prescribed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and the Graves Act, N.J.S.A. 2C:43-6(c).

---

[1] To protect the privacy interest of the victim and witnesses, we use initials and fictitious names. See R. 1:38-3.

A-0019-23

Defendant now appeals from his convictions, arguing that (1) a detective gave improper narrative testimony concerning what was depicted on several videos clips; (2) the video of defendant's interrogation, which was played for the jury, was not properly redacted and included inadmissible statements by a detective that defendant was lying and guilty; and (3) the prosecutor engaged in misconduct by accusing defendant of lying and endorsing the credibility of the State's witnesses. While defendant did not object to any of those issues at trial, he now argues they deprived him of a fair trial. Defendant also appeals from his sentences, challenging the sentences on several grounds.

Having reviewed the record and law, we discern no reversible or plain errors concerning defendant's convictions. We also reject all of defendant's arguments concerning the sentences. So, we affirm his convictions and sentences.

I.

We summarize the facts from the record, primarily relying on the evidence presented at trial.

Shortly after 5:00 p.m. on February 7, 2019, Newark police officers responded to a report of gunshots fired near a public-housing complex on Frelinghuysen Avenue. Police found a man, later identified as Frank, lying

unconscious on the ground in the courtyard of the complex. Frank had been shot in the head, neck, and chest, and his body was surrounded by a pool of blood, as well as several spent shell casings. Frank was taken to a hospital where he was pronounced dead.

During the ensuing investigation, the police learned that there were several establishments in the area with surveillance cameras and they collected video footage from numerous cameras. A camera from City Line Super Liquors faced the housing complex courtyard and captured the shooting on video footage. The police also obtained video footage from several establishments near the housing complex that depicted various people before and after the shooting.

In canvassing the area near the shooting, law enforcement personnel found a silver van parked on the street next to the courtyard where Frank had been shot. Near the van's rear wheel on the driver's side, detectives located and collected a cup that contained a bag of heroin and cocaine.

Detectives investigating the murder also learned that J.H. (Jade) had witnessed the shooting. In an interview, Jade informed Detectives Michael DiPrimio and Tyrone Crawley that she saw defendant shoot Frank and she identified defendant in a photo array. Jade also told the detectives that she had

4

attended high school with defendant, and she had seen defendant in the courtyard of the housing complex on February 7, 2019.

Eight days after the shooting, on February 15, 2019, defendant was arrested. That same day, defendant agreed to be questioned after he waived his Miranda rights.[2] The interrogation was video recorded. During the interrogation, defendant admitted that he had been in the area of the shooting in the hours before the shooting. Defendant claimed, however, that he had left the area at approximately 3:00 p.m., by taking a Red Cab to his mother's house.

DiPrimio reviewed video footage from cameras in the area and later testified that he found no evidence of defendant leaving in a Red Cab. DiPrimio also obtained phone records from the Red Cab Company, which did not show defendant had made a call to the Red Cab Company on the day of the murder. Additionally, detectives obtained a warrant for defendant's cell tower data, and an analysis of the data indicated that defendant's phone was near the area of the shooting until around 5:30 p.m.

On May 10, 2019, defendant was indicted for seventeen crimes. Ten counts of those crimes were severed and tried separately. Those ten counts included charges for first-degree murder; second-degree possession of a weapon

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0019-23

in the course of committing a drug offense, N.J.S.A. 2C:35-5, N.J.S.A. 2C:39-4.1(a); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); two counts of third-degree possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(a); two counts of third-degree possession of CDS with the intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(3); and two counts of second-degree possession with intent to distribute within 500 feet of a public building, N.J.S.A. 2C:35-7.1(a). In a separate indictment, defendant was charged with second-degree certain persons not to have a weapon, N.J.S.A. 2C:39-7(b).

Defendant's trial on those ten counts was conducted in November and December of 2022. At trial, the State called Jade to testify as an eyewitness. The State explained to the jury that Jade had previously been known by a different name but since the shooting she had transitioned.

Jade told the jury that she was near the housing complex courtyard on Frelinghuysen Avenue on the day of the murder, and she admitted using drugs that day. She explained that she knew defendant from high school but had not seen him since that time until the day of the shooting. She also explained that she and defendant had interacted several times on February 7, 2019, talking with

6

each other briefly in the courtyard of the complex and in a nearby supermarket, known as ILJ. Jade told the jury that on the day of the shooting, defendant was wearing gray pants, a black face mask, a black hoodie, and a black coat. She also explained that at one point, she had seen defendant talking with Frank. Jade then testified that she heard gunshots, turned around, and saw defendant shooting Frank.

The State then showed Jade video footage from several different cameras and asked her to explain what the footage depicted. In that regard, Jade was shown footage depicting her and defendant interacting at ILJ supermarket at around noon on the day of the shooting. Jade identified defendant as the person with whom she was with in the store, and she stated she had a clear view of defendant's face when he pulled his face mask down momentarily.

Jade was then shown video footage depicting the shooting. That footage showed a black man bending down near the rear driver's side wheel of a silver van parked near the courtyard. The man then stood up, walked back to the courtyard, walked past Frank, turned around and shot Frank several times. When shown that footage, Jade testified defendant was the person seen bending down near the silver van and defendant was the person seen shooting Frank. In that regard, Jade testified:

7

Q    Do you recognize who that is?

A    By the yellow wall and the brick - - in between - - well, right in front of the brick wall and by the yellow wall, that's [defendant] walking back up to the van.

Q    So, you recognize that to be [defendant] walking towards the van, which we saw in the other angle from the revolving surveillance video.  Is that correct?

A    Yes.

Q    Okay.  Please continue.

     . . . .

Q    And what's [defendant] doing here?

A    He gets to the van and bends down.

Q    Do you recognize who that is to the left?

A    Yup.  That's [Frank].

Q    And at this point, what is [defendant] doing?

A    He's talking to [Frank].

Q    And at this point, what is he doing?

A    Shoots him.

Q.    What is [defendant] doing now?

A.     Running.

Q    Before that, was he just standing over the victim?

A-0019-23

A    Yes.

Q    What did he appear to you to be doing?

A    Shooting him.

Q    And you saw that live, correct?

A    Yes.

The State also called several Newark Detectives to testify, including lead Detective DiPrimio. DiPrimio initially testified that he had conducted a videotaped interrogation of defendant, after defendant waived his rights. The State then played a redacted version of that interrogation for the jury. During that recording, defendant denied involvement in the shooting. In response, DiPrimio twice called defendant a liar, stating "you're gonna look at me and just lie like that," and "you're gonna keep with that lie . . . I don't believe you." When defendant continued to deny involvement in the shooting, DiPrimio stated that everything defendant was saying would be disproved at trial. In that regard, DiPrimio stated "we're gonna disprove the stuff that you're telling us right now . . . at some point . . . you're gonna go to trial," and "[e]verything that you're saying right now is gonna get disproved, right." No limiting instruction regarding these statements was given to the jury.

A-0019-23

Later in his testimony, DiPrimio described his investigation of the murder, including his interview of Jade and his searches and reviews of video footage recovered from the area of the shooting. DiPrimio was then asked to describe what he saw on various video clips taken from cameras located at six different establishments on the day of the shooting.

First, he was shown footage from Manny's Deli recorded at around noon. DiPrimio testified that it depicted the suspect walking down Frelinghuysen Avenue, and he stated the suspect in the video was wearing clothing similar to the person that committed the shooting.

Next, DiPrimio described video footage from ILJ supermarket, and he testified that the suspect depicted in the ILJ supermarket footage was "wearing the same clothing as the person during the shooting." DiPrimio also stated that the video clip showed that the suspect had what "appear[ed] to [b]e a tattoo," on his right hand. Defendant was then asked to show the jury his right hand, which had a tattoo on it.

DiPrimio was then shown footage from City Line Super Liquors, which was recorded at around 3:00 p.m. DiPrimio stated that the video depicted the suspect bending down several times near the rear driver's side wheel of the silver van and then interacting with other people in the courtyard. DiPrimio stated that

at one point, the suspect "appeared to exchange something" with another person. DiPrimio also testified that the suspect in the video had "similar clothing to the person that was the shooter." DiPrimio was then shown footage from the same camera, recorded at around 5:00 p.m. DiPrimio testified that the footage depicted the suspect shooting the victim and then running away after the shooting.

DiPrimio was also shown footage from a rotating camera pointed toward the courtyard recorded at around 5:00 p.m. DiPrimio testified that the footage showed several people running from the courtyard, and the victim's body lying on the ground after the shooting.

Lastly, DiPrimio was shown footage captured from cameras from the Newark Housing apartment buildings and New Community Housing Center. DiPrimio testified that the footage showed the suspect running away from the courtyard after the shooting. In giving that testimony, DiPrimio stated the suspect "tried to go towards the left, closer to the building, out of the view of the camera, and then he went to the right, and now is climbing over the fence." DiPrimio also opined that "the suspect ha[d] his hands in his pockets as if he's holding a gun."

11

Defendant elected not to testify, and he did not call any witnesses. Counsel then gave closing arguments to the jury.

After deliberations, the jury convicted defendant of all ten charges. That same day, following a separate trial, the jury also convicted defendant on the certain-persons charge.

On June 27, 2023, defendant was sentenced. On the conviction for first-degree murder (count ten), defendant was sentenced to sixty years in prison subject to NERA. On the convictions for four of the weapons and drug offenses (counts eleven, twelve, sixteen, and nineteen), defendant was sentenced to ten years in prison on each count, with the sentences to run concurrent to the murder sentence. The convictions for five other crimes (counts thirteen, fourteen, fifteen, seventeen, and eighteen) were merged with other convictions. Lastly, defendant was sentenced to ten years in prison for the certain-persons offense, to run consecutive to the sentences for counts ten, eleven, twelve, sixteen, and nineteen. Thus, defendant's aggregate sentence was seventy years in prison, with fifty-six years of parole ineligibility.

Defendant now appeals from his convictions and his sentences.

A-0019-23

## II.

On appeal, defendant makes four main arguments, three challenging his convictions and one challenging his sentences. He articulates those arguments as follows:

POINT I – THE ADMISSION OF THE LEAD DETECTIVE'S OPINION TESTIMONY ABOUT THE CONTENT OF THE VIDEOS AND SCREENSHOTS VIOLATED N.J.R.E. 701 AND DEFENDANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

POINT II – THE ADMISSION OF THE LEAD DETECTIVE'S STATEMENTS IN THE INTERROGATION THAT DEFENDANT WAS GUILTY AND WAS LYING VIOLATED N.J.R.E. 701 AND DEFENDANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

POINT III – IT WAS REVERSIBLE ERROR FOR THE PROSECUTOR TO REPEATEDLY ACCUSE DEFENDANT OF LYING AND ENDORSE THE CREDIBILITY OF THE STATE'S WITNESSES.

POINT IV – THE MATTER MUST BE REMANDED FOR A NEW SENTENCING HEARING ON BOTH INDICTMENTS BECAUSE THE COURT PENALIZED DEFENDANT FOR WHAT IT DEEMED HIS FAILURE TO EXPRESS REMORSE, ADMITTED THAT IT ALWAYS IMPOSED CONSECUTIVE TERMS ON CERTAIN-PERSONS CONVICTIONS, AND FAILED TO CONSIDER THE OVERALL FAIRNESS OF THE AGGREGATE TERM OF [SEVENTY] YEARS, [FIFTY-SIX] YEARS WITHOUT PAROLE.

13

A. The sentencing errors under Indictment No. 1270.

    1. The court improperly treated lack of remorse as an aggravating factor.

    2. The court improperly penalized [defendant] for exercising his right to remain silent.

    3. The court improperly penalized [defendant] for exercising his right to counsel.

B. The sentencing errors under Indictment No. 1271.

    1. The court arbitrarily imposed a predetermined sentence.

    2. The court misapplied the no-free crimes guideline.

C. Failure to consider overall fairness of the aggregate sentence.

At trial defendant did not raise any objections to the testimony of DiPrimio, the redacted video of his interrogation, or the comments of the prosecutor. Accordingly, we review each of those issues for plain error. State v. Singh, 245 N.J. 1, 13 (2021) (citing R. 2:10-2; State v. Camacho, 218 N.J. 533, 554 (2014)). Under the plain error standard, an appellate court will reverse

14

if the error is "clearly capable of producing an unjust result." State v. Rose, 206 N.J. 141, 157 (2011) (quoting R. 2:10-2).

A.  The Testimony of Detective DiPrimio.

The New Jersey Supreme Court has established rules governing what is and is not permissible when a witness narrates video evidence of events the witness did not observe in real time.  State v. Watson, 254 N.J. 558, 599-604 (2023).[3]  In Watson the Court explained that courts should evaluate the admissibility of video narration under three rules of evidence:  N.J.R.E. 701, N.J.R.E. 602, and N.J.R.E. 403.  Watson, 254 N.J. at 599.  N.J.R.E. 701 states "testimony in the form of opinions or inferences may be admitted if it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue."  N.J.R.E. 602 requires a fact witness to have personal knowledge of matters he or she testifies about.  Finally, N.J.R.E. 403 directs that evidence that is substantially more prejudicial than probative should be excluded.

The Court did not ban all narration testimony but stated "[a]n investigator who has carefully reviewed a video a sufficient number of times prior to trial can . . . satisfy [Rule 701's] 'perception' and [Rule 602's] 'personal knowledge'

---

[3] Defendant is not the same person as the defendant in State v. Watson.

A-0019-23

requirements as to what the video depicts." Watson, 254 N.J. at 601. The Court then identified four principles to guide the admission of narrative testimony concerning video evidence by an investigating law enforcement officer. Id. at 603-04. In that regard, the Court explained:

> First, neither the rules of evidence nor the case law contemplates continuous commentary during a video by an investigator whose knowledge is based only on viewing the recording. To avoid running commentary, counsel must ask focused questions designed to elicit specific, helpful responses. "What do you see?" as an introductory question misses the mark.
>
> Second, investigators can describe what appears on a recording but may not offer opinions about the content. In other words, they can present objective, factual comments, but not subjective interpretations.
>
> . . . .
>
> Third, investigators may not offer their views on factual issues that are reasonably disputed. Those issues are for the jury to decide. So a witness cannot testify that a video shows a certain act when the opposing party reasonably contends that it does not.
>
> . . . .
>
> Fourth, although lay witnesses generally may offer opinion testimony under Rule 701 based on inferences, investigators should not comment on what is depicted in a video based on inferences or deductions, including any drawn from other evidence.
>
> [Ibid. (citations omitted).]

A-0019-23

Appellate courts review trial court's evidentiary rulings for abuse of discretion. Singh, 245 N.J. at 12-13. In other words, "evidentiary rulings are entitled to deference" and they will be reversed only if "there has been a clear error of judgment." Ibid. (quoting State v. Nantambu, 221 N.J. 390, 402 (2015)). Moreover, when, as in this appeal, there was no objection at trial, "the error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached." State v. R.K., 220 N.J. 444, 456 (2015).

Defendant alleges that the trial court improperly allowed DiPrimio to give lay-opinion testimony in narrating several videos clips played for the jury. DiPrimio commented on six different videos clips and defendant takes issue with five aspects of DiPrimio's testimony: (1) that the "suspect" depicted in certain video clips was wearing clothes similar to the suspect who was depicted shooting the victim in another video clip; (2) that the "suspect" depicted in ILJ supermarket several hours before the shooting had a tattoo on his hand; (3) DiPrimio's description of what the "suspect" was doing near the van before the shooting; (4) the actions the "suspect" took in fleeing after the shooting; and (5) while running away the "suspect" had his hands in his pockets as if he was holding a gun.

A-0019-23

Initially, it is important to place DiPrimio's comments in context. Before DiPrimio testified, the jury heard the testimony of Jade, an eyewitness to the shooting. Critically, Jade had already described several of the key video clips to the jury, including the clip depicting the shooting of Frank. As a witness who had seen the events in real time, Jade's testimony was admissible. See Watson, 254 N.J. at 599 (explaining that a witness may "offer lay opinion testimony about parts of a recording that depict what they perceived in real time"). Indeed, defendant does not challenge the admissibility of any of Jade's testimony, including her descriptions of the video clips she was shown at trial.

DiPrimio did not narrate any of the video clips. Instead, he was asked specific questions about his observations of specific portions of various video clips, and he answered the questions asked. Most of his comments did not violate the rules set down in Watson. In that regard, DiPrimio's description of what the suspect was doing near the van and the actions the suspect took in fleeing after the shooting, described what the person depicted in the video footage was doing. DiPrimio did not offer lay opinions in those descriptions. For example, DiPrimio never stated that the suspect was selling drugs. Instead, he described what appeared to be interactions between the suspect and others, but he did not offer an opinion as to what those actions depicted. Similarly, in

describing the suspect's actions after the shooting, DiPrimio stated: "He tried to go towards the left, closer to the building, out of the view of the camera, and then he went to the right, and now is climbing over the fence." Those comments did not expressly offer the opinion that the suspect was trying to avoid being seen by the camera; rather DiPrimio described how the suspect was moving in relation to the camera.

There were three comments, however, that went beyond what Watson allows. At one point, DiPrimio testified that the suspect was wearing the "same" clothes as the suspect depicted in the video clip showing the shooting. That comment, however, followed a series of times where DiPrimio properly stated that the clothes appeared to be or looked like the clothes worn by the suspect in the other video. Critically, DiPrimio always described the person depicted as a suspect and not defendant. See Singh, 245 N.J. at 17 (explaining that it is improper for an officer to refer to "an individual depicted [in] surveillance video as 'the defendant'"). Accordingly, viewed in context, the comment did not constitute plain error or reversible error.

Second, DiPrimio stated that the suspect's hand looked like it had a tattoo. The comment, while an inadmissible lay opinion, was not plain error or

reversible error. The jury could evaluate for itself whether the video depicted a tattoo.

Finally, DiPrimio stated that the "suspect has his hands in his pockets as if he's holding a gun." That comment was also an inadmissible lay opinion. The comment, however, was not reversible error or plain error. DiPrimio made that comment in describing a video showing the suspect running after the shooting. The jury had already heard testimony from Jade that the suspect had a gun at the time of the shooting and then ran away from the shooting.

Finally, to the extent that any of DiPrimio's comments were inadmissible lay opinions, they were harmless error in the context of defendant's trial. An error will be considered harmless unless it is "'sufficient to raise a reasonable doubt as to whether the' jury would have reached a different conclusion absent the error." State v. Butler, ___ N.J. ___, ___ (2026) (slip op. at 20) (quoting State v. Williams, 244 N.J. 592, 608 (2021)). In other words, the error must "substantially prejudice the defendant's fundamental right to have a jury fairly evaluate the merits of his [or her] defense." Ibid. (quoting Williams, 244 N.J. at 608-09). Here, DiPrimio's comments did not substantially prejudice defendant because they were brief and isolated, and the jury had already heard

eyewitness testimony from Jade identifying defendant as the suspect in the videos.

B.    The Video of Defendant's Interrogation.

At trial, the jury was shown a redacted portion of a video of defendant's interrogation after he was arrested.  The State had moved pretrial to admit the video, and the court held a hearing on that matter.  At the pretrial hearing, the court ruled that the interrogation could be admitted and the parties discussed and agreed on the portions of the video that would be played and what would be redacted.  For the first time on appeal, defendant argues that the video included inadmissible comments by DiPrimio that accused defendant of lying and reflected DiPrimio's view that defendant was guilty of the murder.

It is well established that "police officers may not opine directly on a defendant's guilt in a criminal case."  State v. Trinidad, 241 N.J. 425, 445 (2020).  An important corollary to this rule is that an officer may not "offer an opinion that a defendant's statement is a lie."  State v. Tung, 460 N.J. Super. 75, 101 (App. Div. 2019).  Indeed, an officer's "opinions as to defendant's truthfulness and guilt . . . [are] not admissible as either demeanor evidence or lay opinion."  State v. C.W.H., 465 N.J. Super. 574, 594 (App. Div. 2021) (alteration and omission in original) (quoting Tung, 460 N.J. Super. at 101).  An officer's

opinion concerning a defendant's credibility or guilt is particularly problematic because, in offering such an opinion, the officer may "suggest[] that [his or her] own experience and specialized training enabled [he or she] to determine that defendant was lying." Ibid. (quoting Tung, 460 N.J. Super. at 103).

While the failure to redact DiPrimio's statements was an error, the comments do not constitute reversible or plain error. The statements were made during the interrogation where detectives were questioning defendant after he had waived his Miranda rights and agreed to speak with the detectives. The jury was properly instructed to make its own determination on credibility. The jury was also carefully instructed that they, and they alone, would determine whether defendant was guilty. Given those clear instructions, and the substantial evidence presented against defendant at trial, we discern no reversible error in the failure to delete several comments from a video clip of defendant's interrogation. See State v. Cotto, 471 N.J. Super. 489, 539-41 (App. Div. 2022) (holding that failure to redact an part of an interrogation—where a detective opined the defendant was the suspect on video and was guilty—was not plain error given the substantial "admissible evidence proving guilt beyond a reasonable doubt").

A-0019-23

C.      The Remarks by the Prosecutor.

Next, the defendant argues that it was reversible error for the prosecutor to repeatedly accuse defendant of lying while also endorsing the credibility of the State's witnesses.  Because there was no objection at trial, we review these comments in the overall context of the trial to see if they constitute plain error.

Generally, "[p]rosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented."  State v. Williams, 471 N.J. Super. 34, 43 (App. Div. 2022) (quoting State v. Frost, 158 N.J. 76, 82 (1999)).  "A prosecutor must 'conscientiously and ethically undertak[e] the difficult task of maintaining the precarious balance between promoting justice and achieving a conviction,' ensuring that at all times [their] 'remarks and actions [are] consistent with [their] duty to ensure that justice is achieved.'"  State v. Jackson, 211 N.J. 394, 408 (2012) (first and third alterations in original) (quoting State v. Williams, 113 N.J. 393, 447-48 (1988)).

"A prosecutor may attempt to persuade the jury that a witness is not credible and in doing so, 'may point out discrepancies in a witness's testimony or a witness's interests in presenting a particular version of events.'"  State v. Supreme Life, 473 N.J. Super. 165, 174 (App. Div. 2022) (quoting State v.

23

Johnson, 287 N.J. Super. 247, 267 (App. Div. 1996)). Nevertheless, "[i]t is improper for a prosecutor to express his [or her] personal opinion on the veracity of any witness." Ibid. (quoting State v. Rivera, 437 N.J. Super. 434, 463 (App. Div. 2014)); see also State v. Pennington, 119 N.J. 547, 577 (1990) (explaining that it is improper to label defendant as a "liar" during opening statement and summation). Likewise, a prosecutor may not personally vouch for the credibility of a witness. State v. Staples, 263 N.J. Super. 602, 606-07 (App. Div. 1993).

Not every prosecutorial misstep requires a new trial. State v. Garcia, 245 N.J. 412, 436 (2021). "Only when the prosecutor's conduct in summation so 'substantially prejudice[s] the defendant's fundamental right to have the jury fairly evaluate the merits of his defense' must a court reverse a conviction and grant a new trial." Ibid. (quoting State v. Bucanis, 26 N.J. 45, 56 (1958)). In other words, the prosecutor's conduct must be "so egregious that it deprived the defendant of a fair trial." Frost, 158 N.J. at 83.

In this matter, the prosecutor improperly commented several times during summation that defendant was lying regarding his alibi when he was questioned by DiPrimio. In that regard, the prosecutor stated "[a]nd then we get to the statement [defendant] gave to the police because in that statement he flat out did

24

not tell the truth.  In fact, he went far from the truth."  The prosecutor went on to state defendant "lied when he said he left the area between 3[:00] and 3:30 [p.m.]," and "lied about leaving between 3[:00] and 3:15 [p.m.]."  The prosecutor also stated "[i]f you notice in the statement when he was giving his address, he lied."  Additionally, the prosecutor briefly commented on the factors the jurors should consider in judging the credibility of a witness and stated "[a]pplying those factors to the credibility of [Jade], DiPrimio, [and other detectives], those factors I suggest to you all weigh in favor of those witnesses."

Nevertheless, these errors do not warrant reversal of defendant's convictions.  Although the prosecutor erred in making these comments, in the overall context of the trial, there were a few isolated misstatements.  Having reviewed the full record, and the strong evidence provided by Jade and the video footage, we are convinced that defendant received a fair trial.  See State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)) (explaining that even when a prosecutor's comments "stray over the line of permissible commentary," reversal is not required unless it "deprive[d] defendant of a fair trial").

A-0019-23

D. The Sentences.

Defendant challenges his sentences, contending that the sentencing court penalized him for his lack of remorse, improperly imposed a ten-year consecutive sentence for his conviction for being a certain person not to have a weapon, and failed to consider the overall fairness of the aggregate sentence. We reject all these arguments because they are not supported by the record.

An appellate court's standard of review of sentences is well-established and deferential. State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Fuentes, 217 N.J. 57, 70 (2014)). We will affirm a trial court's sentences unless: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

When sentencing a defendant for more than one offense, "such multiple sentences shall run concurrently or consecutively as the court determines at the time of sentence." N.J.S.A. 2C:44-5(a). In State v. Yarbough, our Supreme Court established criteria that a sentencing court must consider when deciding

26

whether to impose consecutive sentences. 100 N.J. 627, 643-44 (1985). Namely, the court must evaluate whether:

(a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

[Id. at 644.]

"The Yarbough factors are qualitative, not quantitative; applying them involves more than merely counting the factors favoring each alternative outcome." Cuff, 239 N.J. at 348 (citing State v. Molina, 168 N.J. 436, 442-43 (2001); State v. Carey, 168 N.J. 413, 427-28 (2001)).

When a sentencing court fails to explain its decision to impose consecutive sentences, a remand is generally required for the judge to provide an explanation on the record. State v. Miller, 205 N.J. 109, 129 (2011). The Supreme Court has emphasized this principle and explained:

> In sum, while the Code is animated by the overarching goal of ensuring "a predictable degree of uniformity in sentencing," uniformity and predictability should not come at the expense of fairness and proportionality. We reiterate the repeated instruction that a sentencing court's decision whether to impose consecutive sentences should retain focus on "the fairness of the overall sentence." Toward that end, the sentencing court's explanation of its evaluation of the fairness of the overall sentence is "a necessary feature in any Yarbough analysis."
>
> [State v. Torres, 246 N.J. 246, 270 (2021) (citations omitted).]

Defendant first argues that the sentencing court penalized him for not expressing remorse. He contends that the court treated his perceived lack of remorse as an aggravating factor and the court effectively punished him for exercising his right to remain silent.

A review of the sentencing transcript discloses that the court carefully and appropriately considered the sentences it imposed. The court reviewed the aggravating and mitigating factors. In that regard, the court found aggravating factors three (the likelihood of reoffending), N.J.S.A. 2C:44-1(a)(3), six (the prior criminal history), N.J.S.A. 2C:44-1(a)(6), and nine (the need to deter), N.J.S.A. 2C:44-1(a)(9). The court also found mitigating factor fourteen because defendant was under the age of twenty-six when he committed the crimes. N.J.S.A. 2C:44-1(b)(14). The court then found the aggravating factors

28

substantially outweighed the mitigating factor. All those findings are supported by substantial evidence in the record.

The court also carefully reviewed defendant's personal history, as well as his criminal history. While the court noted defendant showed no remorse at the sentencing hearing, that comment did not reflect an improper consideration of the lack of remorse. The court never said it was considering the lack of remorse as a separate aggravating factor, and it did not treat the lack of remorse as a separate aggravating factor. The court also never indicated that it was penalizing defendant for exercising his constitutional right to remain silent during trial and sentencing.

Next, defendant asserts that the sentencing court stated that it always imposed a consecutive prison sentence for a certain-persons conviction. Again, the record does not support that claim. Prior to the separate trial on the certain-persons offense, the court told defendant that he could, if he chose, try to negotiate a plea agreement with the State, and the State might be willing to agree to recommend a concurrent sentence on the certain-persons conviction. Specifically, the court told defendant: "You could plead to that [charge] and maybe see if the State would be willing to run the second indictment concurrent to the underlying or, if not - - historically, I have always done consecutive

sentences.  But you can … discuss it with the State and see what they are willing to do or not do."

The court's fleeting statement concerning its historical sentences did not reflect a ridged view of what the court would always do.  Read in context, the court was advising defendant of an opportunity to avoid a consecutive sentence by negotiating a plea agreement.  Importantly, the court did not say what sentence it would impose if defendant elected to proceed to the second trial on the certain-persons charge.

Defendant also argues that the trial court misapplied the Yarbough factors in imposing a consecutive sentence for the certain-persons conviction.  The record rebuts that contention.  The court expressly discussed N.J.S.A. 2C:44-5 and the Yarbough factors.  Indeed, the sentencing transcripts reflect that the court carefully and appropriately considered all the factors and it then carefully weighed those factors.

Finally, we reject defendant's argument that this matter should be remanded for resentencing because the court did not expressly state that it had considered the overall fairness of the sentences imposed.  The sentencing court individually analyzed each of defendant's ten convictions.  In sentencing defendant on the murder conviction, the court noted that the State had requested

30

a sentence of life in prison. Instead, the court imposed a sixty-year prison term subject to NERA. On defendant's other convictions, the court either imposed concurrent prison terms or merged those convictions. Consequently, when the court imposed a ten-year consecutive prison sentence for the certain-persons conviction, the court clearly understood that it was imposing a seventy-year prison sentence, with fifty-six years of parole ineligibility.

To the extent that the sentencing court did not expressly use the terms "overall fairness," we discern no need for resentencing because the court articulated the reasons why the sentences were fair and appropriate. See State v. Lebron, ___ N.J. Super. ___ (App. Div. 2026) (slip op. at 38) (holding a "comprehensive analysis of the Yarbough factors and [] an express finding of fairness of the overall sentence" was sufficient despite not using the specific phrase "overall fairness").

Torres and Yarbough require a sentencing court to provide an explanation of its evaluation of the fairness of the overall sentence. The sentencing court did exactly that in this matter. While the sentences were lengthy, the court also had heard from the victim's family and had explained the reason for the lengthy sentences.

31

## III.

In summary, having considered all of defendant's arguments, we affirm his convictions and sentences. Considered in full context, the record establishes that defendant received a fair trial and that the evidence against him was strong. The record also demonstrates that while defendant was sentenced to a lengthy imprisonment, the sentencing court considered the appropriate factors, including an appropriate sentence for a conviction of first-degree murder.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hanley*

Clerk of the Appellate Division

A-0019-23